487 S.W.2d 502 (1972)
In the Interest of J. R. M., a child under seventeen years of age, Appellant.
No. 57598.
Supreme Court of Missouri, En Banc.
December 11, 1972.
*503 J. Arnot Hill, Hill & McMullin, Kansas City, for appellant.
James F. Speck, Asst. Pros. Atty., Kansas City, for respondent.
FINCH, Chief Justice.
This case was transferred here by the Missouri Court of Appeals, Kansas City District, to resolve constitutional issues concerning the search and seizure of evidence from an automobile. Sole jurisdiction as to constitutional questions lies in this Court. Art. V, § 3, Constitution of Missouri, V.A.M.S. We decide the case as though here on direct appeal. We reverse and remand.
The Juvenile Officer of Jackson County filed a petition in Juvenile Court alleging that appellant, J. R. M., a 16-year-old male, was in need of care, treatment and services of the court because allegedly he murdered a 13-year-old girl. After an extensive hearing, at which appellant was represented by counsel, the Juvenile Court sustained the petition and ordered appellant committed to the custody of the State Division of Mental Health.
The first question presented on appeal is whether the evidence was sufficient to authorize the Juvenile Court to assume jurisdiction over J. R. M. The Court of Appeals first concluded that if evidence obtained in the search of the automobile was excluded, the remaining evidence would be insufficient. However, when all evidence introduced, including that taken from the automobile, was considered, the court held it to be sufficient to show beyond a reasonable doubt that appellant killed the girl, and that the court should assume custody of him. We agree with both of those conclusions. Hence, we proceed to the other questions raised, viz., whether appellant had standing to object to the search and seizure, and if he did, whether the warrantless search was permissible and valid.
On the morning of October 9, 1970, the body of a 13-year-old girl was discovered in Swope Park in Kansas City. Death had been caused by blows to the head by some instrument like a ball peen hammer. Investigation disclosed that on October 6 and 7 the deceased and a girl friend had gone from school to a Katz Store, from which, after a time, they started to hitchhike a ride home. The deceased's girl friend told police that on both days they were picked up by a boy driving a red Corvair. It had certain distinguishing scratches and marks. The girl also noticed a sticker on the car radio which read "Made Especially for _____M_____."
The police learned that on October 8 the deceased again went from school to the Katz Store and had a coke with a classmate, after which both went out to catch a bus. The deceased missed her bus but then was observed by her classmate getting into a red Corvair. On the following day her body was discovered.
Investigation at the school disclosed the name of a student whose last name was the same as the one on the sticker in the Corvair. The police went to the address of that student and there observed a red Corvair parked in the driveway. An officer looked through the window of the car and observed on the radio a sticker which read "Made Especially for _____M_____."
On the next morning, October 10, appellant and his father were called to the police *504 station and asked about the murder. Questioning of appellant was not permitted by the father. However, appellant did state that he knew the deceased and that she had been in the Corvair. At the trial, the police testified that appellant had said she was in the Corvair only on October 6, but appellant testified that he had stated to the police that deceased was in the car on October 6 and 7.
On October 13 the police located the Corvair on a downtown parking lot rented by appellant's father. They testified at the trial that they had been unable to locate it between October 10 and October 13. No one was present when the police located it on the parking lot. They proceeded to have it towed to the police station where they examined it thoroughly and had it partially disassembled by police technicians. No search warrant had been obtained. The police testified that they had talked to the Prosecuting Attorney's Office about a search warrant and were told that one could not be obtained under Missouri law, but that they could seize and examine the car on the basis of the decision by the Supreme Court of the United States in Chambers v. Maroney, 399 U.S. 42, 90 S. Ct. 1975, 26 L.Ed.2d 419. Subsequently, on October 26, thirteen days after the car was seized, appellant was arrested.
The examination of the automobile at the police garage consisted of a thorough vacuuming of the interior, obtaining scrapings of dust and fibers adhering to the vinyl upholstery, removal of a portion of the right floor mat, dismantling of the right front seat, and dismantling of the right front door panel and door sill. The police officer who conducted the initial examination testified that prior to any dismantling, he observed what appeared to be blood stains on inconspicuous portions of the right seat, right door panel and on a book under the right seat.
The laboratory expert testified in detail concerning the contents of the vehicle which he examined. He told of the various blood stains and stated that, where sufficient for grouping purposes, they were type "O" negative human blood, the blood type of the deceased girl. An expert also testified as to scrapings removed from the right seat and carpet of the Corvair. He identified a human hair of the deceased as coming from the vehicle. In addition, four fibers from a seat scraping were found to be identical to fibers found in the jumper the victim wore on the day she was killed. Her mother testified that October 8 was the only day the victim had worn that particular jumper. The expert also testified that the blouse of the victim had a synthetic fiber on it of a similar microscopic characteristic as fiber in the carpet in the Corvair.
According to the theory of the State, blood had dripped down from the head wound onto parts of the girl's body and garments, as well as causing the blood spots found in the car. This theory was buttressed by the fact that the position of the deceased's right arm was such when rigor mortis set in that it indicated that she had been in a bent or wedged position in the right front seat of the automobile with her right arm propped against the car door.
Prior to trial, appellant filed a motion to suppress the evidence obtained by search and seizure of the automobile, which motion the court heard with the case. Appellant also objected to the evidence when offered. The court overruled the motion and objections and in deciding the case considered the evidence obtained by search and seizure of the automobile. The court concluded that appellant had no standing to object to the search and seizure, but even so went ahead and stated additionally that he considered the search and seizure to have been permissible under the case of Chambers v. Maroney, supra.
The second question for decision is whether appellant had standing to assert that the warrantless search and seizure of the Corvair violated his rights under the *505 Fourth Amendment to the Federal Constitution and Art. I, § 15, of the Constitution of Missouri, V.A.M.S. The State claims he did not, saying he had no possessory interest therein (he did not own the car or have possession or custody thereof at the time of seizure), he was not on the premises when the search occurred, and possession of the seized evidence itself (automobile) was not an essential element of the crime charged.
It seems clear that earlier federal cases equated standing to attack search and seizure with property or possessory rights in the premises searched or items seized. See Boyd v. United States, 116 U.S. 616, 6 S. Ct. 524, 29 L.Ed. 746. However, beginning at least with Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, it seems clear that the United States Supreme Court recognized a liberalized basis for determining standing. In Jones, defendant had permission of the lessee of an apartment to use that apartment. He had a key thereto, kept some clothes in the apartment and had slept there. He also was present at the time the officers made their search and found narcotics. Defendant made no claim of ownership of the narcotics, but claimed a right to have quashed the evidence seized by the officers. The Supreme Court agreed. It first held that it was unfair to require one to claim and prove ownership to acquire standing when such proof was sufficient to convict him of the crime charged, and that standing should be conferred automatically on one in such dilemma. Secondly, the court held it no longer was necessary to establish ownership or some property right in the premises. Distinctions between lessee, licensee, invitee and guest were eliminated.
In finalizing its announcement that the defendant Jones had standing, the court said, 362 U.S. 1. c. 267, 80 S.Ct. 1. c. 734: "No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him. This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched. As petitioner's testimony established Evans' consent to his presence in the apartment, he was entitled to have the merits of his motion to suppress adjudicated."
Several cases following Jones involved the question of standing. In Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L. Ed.2d 782, a robbery of a cab company occurred and defendant was seen fleeing therefrom. He was followed until he entered a private residence. Police were alerted, went to the house, asked for and were granted permission to enter, and then searched the house, finding defendant feigning sleep. A search of the whole house followed, in which officers found weapons and clothing which implicated defendant. In discussing the issue of standing and the decision in Jones, the court said, 387 U.S. 1. c. 304, 87 S.Ct. at 1. c. 1648:
"The premise that property interests control the right of the Government to search and seize has been discredited. * * * We have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts. See Jones v. United States, 362 U.S. 257, 266, 80 S.Ct. 725, 733, 4 L.Ed.2d 697; Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734." Subsequently, 387 U.S. 1. c. 305, 87 S.Ct. at 1. c. 1649, the court said: "In determining whether someone is a `person aggrieved by an unlawful search and seizure' we have refused `to import into the law . . . subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions *506 whose validity is largely historical.' Jones v. United States, supra, 362 U.S., at 266, 80 S.Ct., at 733. And with particular relevance here, we have given recognition to the interest in privacy despite the complete absence of a property claim by suppressing the very items which at common law could be seized with impunity: * * *."[1]
In Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, decided soon after Warden, the court was concerned with a Government wire tap installed in a public telephone booth. The court really does not speak of standing as such, but does discuss whether the telephone booth was a protected area in which the defendant had a right of privacy. In holding it was, the court said: "But this effort to decide whether or not a given `area,' viewed in the abstract, is `constitutionally protected' deflects attention from the problem presented by this case. For the Fourth Amendment protects people not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. See Lewis v. United States, 385 U.S. 206, 210, 87 S.Ct. 424, 427, 17 L.Ed.2d 312; United States v. Lee, 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. See Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688; Ex parte Jackson, 96 U.S. 727, 733, 24 L.Ed. 877." Subsequently, at 389 U.S. 1. c. 352, 88 S.Ct. at 1. c. 511, the court said: "No less than an individual in a business office, in a friend's apartment, or in a taxicab, a person in a telephone booth may rely upon the protection of the Fourth Amendment. One who occupies it, shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world."
Next came Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247. In that case a federally insured Savings and Loan Association was robbed. Later that day, FBI agents made a warrantless search of the home of the mother of one Andrews, who, along with Simmons and Garrett, subsequently were indicted for the crime. The officers found two suitcases in the basement of Andrews' mother's house, one of which contained incriminating evidence. On a motion to suppress the suitcase and items therein, Garrett testified that the suitcase was similar to one he owned and that he owned the clothing found therein. The trial court overruled the motion to suppress and, in addition, allowed the Government to use against Garrett on the issue of guilt the testimony given by him on his motion to suppress. The Supreme Court held that this was error, but in so doing referred to its earlier decision in Jones and stated that it had relaxed the standing requirements in that decision. In that connection, the court said, 390 U.S. 1. c. 389, 88 S.Ct. at 1. c. 974:
"However, we have also held that rights assured by the Fourth Amendment are personal rights, and that they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure. See, e. g., Jones v. United States, 362 U.S. 257, 260-261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697. At one time a defendant who wished to assert a Fourth Amendment objection was required to show that he was the owner or possessor of the seized property or that he had a possessory interest in the searched premises. In part to avoid having to resolve the issue presented by this case, we relaxed those standing requirements in two alternative ways in Jones v. United States, supra. First, we held that when, as in Jones, possession of the seized evidence is itself an essential element of the offense with which the defendant is charged, the *507 Government is precluded from denying that the defendant has the requisite possessory interest to challenge the admission of the evidence. Second, we held alternatively that the defendant need have no possessory interest in the searched premises in order to have standing; it is sufficient that he be legitimately on those premises when the search occurs."
At the next term, the court decided the case of Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154. This case involved a warrantless search of a Union office in which the defendant was employed. Defendant sought by motion to suppress to prevent evidence seized in said search from being used against him. The standing of DeForte to ask suppression of the evidence was considered by the court. In holding that DeForte did have standing, the court said, 392 U.S. 1. c. 367, 88 S.Ct. at 1. c. 2123:
"Furthermore, the Amendment does not shield only those who have title to the searched premises. It was settled even before our decision in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, that one with a possessory interest in the premises might have standing. See, e. g., United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59. In Jones, even that requirement was loosened, and we held that `anyone legitimately on premises where a search occurs may challenge its legality. . . when its fruits are proposed to be used against him.' 362 U.S., at 267, 80 S.Ct. at 734. The Court's recent decision in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, also makes it clear that capacity to claim the protection of the Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion. See 389 U.S., at 352, 88 S.Ct., at 511. The crucial issue, therefore, is whether, in light of all the circumstances, DeForte's office was such a place."
Subsequently, the court also said, 392 U. S. 1. c. 370, 88 S.Ct. at 1. c. 2124:
"Our conclusion that DeForte had standing finds strong support in Jones v. United States, supra. Jones was the occasional occupant of an apartment to which the owner had given him a key. The police searched the apartment while Jones was present, and seized narcotics which they found in a bird's nest in an awning outside a window. Thus, like DeForte, Jones was not the owner of the searched premises. Like DeForte, Jones had little expectation of absolute privacy, since the owner and those authorized by him were free to enter. There was no indication that the area of the apartment near the bird's nest had been set off for Jones' personal use, so that he might have expected more privacy there than in the rest of the apartment; in this, it was like the part of DeForte's office where the union records were kept. Hence, we think that our decision that Jones had standing clearly points to the result which we reach here."
Finally, on June 26, 1972, the Supreme Court decided Combs v. United States, 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308. In that case Combs and a companion took some whiskey known to have been stolen from an interstate shipment and hauled it to a farm in Kentucky belonging to Combs' father, where they stored it in a shed. Later, officers seized the whiskey under a search warrant which defendant Combs claimed to have been issued without a proper showing. On certiorari, the Supreme Court vacated a decision by the Court of Appeals that defendant had no standing to attack the search and seizure. The case was remanded to the District Court for appropriate proceedings. In so deciding, the court said, 408 U.S. 1. c. 226, 92 S.Ct. 1. c. 2286, 33 L.Ed.2d 1. c. 311:
"In concluding that petitioner lacked such standing, the Court of Appeals noted, inter alia, that he had `asserted no possessory or proprietary claim to the searched premises' during the course of the trial. *508 446 F.2d, at 516. Clearly, however, petitioner's failure to make any such assertion, either at the trial or at the pretrial suppression hearing, may well be explained by the related failure of the Government to make any challenge in the District Court to petitioner's standing to raise his Fourth Amendment claim. In any event, the record now before us is virtually barren of the facts necessary to determine whether petitioner had an interest in connection with the searched premises that gave rise to `a reasonable expectation [on his part] of freedom from governmental intrusion' upon those premises. Mancusi v. DeForte, 392 U.S. 364, 368, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154, 1159 (1968). If petitioner can establish facts showing such an interest, he will have demonstrated a basis for standing to attack the search; re-examination of the validity of the warrant in light of the Government's present position on that issue would then be appropriate to resolve the question whether evidence of the seized whiskey was properly introduced at petitioner's trial."
Analysis of these recent decisions indicates that no simple, well-defined, all-encompassing test for determining standing is articulated. Jones signalled the end of a requirement that property or possessory rights in the premises or property be shown. It assured standing to one legitimately on the premises as well as to one who otherwise might be required to face the dilemma of claiming ownership of property which might convict him. Hayden simply reaffirmed Jones. In Katz, standing was extended to an occupant of a public telephone booth. Simmons recognized standing in the owner of a suitcase seized in the search of the home of the mother of a codefendant, even though defendant was not present at the time of the search. In DeForte the defendant was held to have standing to object to use of evidence seized in the search of the Union office where he worked. For the first time, the court, in referring to the earlier decision in Katz, placed the determination of standing on whether "the area was one in which there was a reasonable expectation of freedom from governmental intrusion." 392 U.S. 1. c. 368, 88 S.Ct. 1. c. at 2124. Finally, Combs restated the foregoing test and recognized that thereunder the defendant might show facts establishing standing, even though he did not own the premises where the whiskey was stored, did not live there, and was not present when the search occurred.
The conclusion we draw from these cases is that the Supreme Court has approached the issue of standing on a case by case basis, examining the facts in each case to determine the relationship of defendant to the premises and property and to determine whether defendant was entitled to and did have a reasonable expectation that the property would be free from governmental intrusion other than by a proper and lawful search and seizure.
Many Missouri cases, like earlier federal cases, predicated standing on ownership or right of possession. However, in State v. Ross, 438 S.W.2d 8, this court specifically recognized the effect of the decision in Jones on the determination of standing in state cases, saying, 438 S.W.2d 1. c. 10: "Appellant's standing to object under the circumstances of this case was established in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697." In Ross the defendant sought to exclude evidence seized in a house where he lived with his mother, a sister and a brother. The State contended Ross was a "mere lodger" who did not have standing. This court, in overruling that contention, said, 438 S.W.2d 1. c. 10: "The facts as found by the trial court compel a finding of proprietary interest or standing in Charles Ross which call for application of the rule of Jones v. United States, supra; and, since the evidence seized, the check protector and other checks similar to the uttered check, was damaging evidence on the issue of his knowledge that the uttered check was a forgery, its admission at trial was not harmless error." The opinion noted that *509 Jones had done away with the gossamer distinctions between property concepts which had ruled the issue of standing in earlier cases.
The most recent Missouri case which considered the issue of standing was State v. May, Mo., 479 S.W.2d 451. In that case, instead of announcing that defendant had no standing because he lacked a proprietary interest in the car, this court analyzed the factual situation to determine what connection, if any, the defendant had with the parked automobile which was searched. In so doing, we followed United States v. Ray, 8th Cir., 456 F.2d 1006. In both cases the court concluded that the defendant's evidence disclosed no connection with the place searched (automobile in May and hotel room in Ray). Under those circumstances, both courts concluded that the defendant did not show standing.
When we analyze the facts of this case to determine appellant's connection with the Corvair and whether such connection could give rise to "a reasonable expectation [on his part] of freedom from governmental intrusion" to seize, dismantle and search the car, we note that the evidence shows that appellant had the right to use this Corvair at any time; that, in fact, he regularly drove it to school; and that he used the car much as he would have done if title had been in him. He had his own key to the car and was included in the insurance coverage thereon. Furthermore, he lived with his parents where the car was kept. Is that sufficient to show standing?
If the search had been of the house in which appellant lived with his parents and officers had seized evidence against appellant from the bathroom used by him and others, it seems clear, under the Supreme Court decisions, that he would have standing to object to evidence obtained by an unauthorized search, even though he was not present when the search occurred. The question then becomes one of whether he must show more to establish standing as to the search of the Corvair than he would have been required to do in the case of a search of the bathroom in the house where he lived. In our view, the standard for establishing standing should be and is the same in both cases. In Katz the Supreme Court considered the issue of standing in regard to intrusion into the privacy of a public telephone booth. The test applied was the same as it would have been if a residence had been involved. We perceive no reason for a different approach or test where the search is of an automobile. It is true that the Supreme Court in Chambers v. Maroney, supra, and Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, relaxed under certain circumstances the requirements as to a right of search and seizure of motor vehicles because of their mobility, but those holdings do not imply that any difference in the requirements for standing should exist in the search of a home, office, phone booth, or automobile.
If we should deny standing to appellant herein under the factual situation that existed, we logically also would be required to deny standing to the wife of the owner of an automobile who had no title thereto but who used the car regularly, as did the appellant here. We do not believe that such denial of standing would accord with the recent United States Supreme Court decisions on that question. Accordingly, we hold that appellant did have standing to seek to suppress the evidence obtained by search and seizure of the Corvair.
We must determine, therefore, whether the warrantless seizure and subsequent search of the automobile at the police garage were authorized.
In overruling appellant's motion to suppress, the trial court stated: "Up until Chambers v. Morney (sic) I would have agreed with the argument Mr. Hill made with respect to the legality of this search. But if I understand Chambers v. Morney, I think the Supreme Court of the United *510 States has broadened, Mr. Hill, the authority to search, even expanding on the right to search beyond that authorized by the Missouri statute."
Chambers dealt with the search of an automobile at the police station subsequent to an armed robbery at a filling station. Certain information was reported to the police by the station attendant and other witnesses, and thereafter the police stopped a station wagon and arrested the four occupants. The vehicle was not searched at the scene but was taken to the police station where a search was made. The Supreme Court upheld the search, not on the basis that it was incident to an arrest (since it occurred at another time and place, Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777), but on the basis that there was probable cause to seize the car itself and search it for guns and stolen money under the doctrine of Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. In so holding, the court said, 399 U.S. 1. c. 47, 90 S.Ct. at 1. c. 1979. "Here the situation is different, for the police had probable cause to believe that the robbers, carrying guns and the fruits of the crime, had fled the scene in a light blue compact station wagon which would be carrying four men, one wearing a green sweater and another wearing a trench coat. As the state courts correctly held, there was probable cause to arrest the occupants of the station wagon that the officers stopped; just as obviously was there probable cause to search the car for guns and stolen money."
Many cases, both federal and state, have dealt with this troublesome problem of search and seizure and an extensive discussion and analysis of those cases could be made. We conclude, however, that our consideration should focus primarily on Chambers and on the later case of Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. Hence, we limit our discussion primarily to those two cases.
The case of Coolidge v. New Hampshire, supra, was decided subsequent to the trial of the instant case and after an appeal therein had been taken. In Coolidge a 14-year-old girl left her home on January 13 during a snowstorm. Her body was found eight days later by the edge of a rural road. The police learned that defendant had been away from home on the evening the girl disappeared, and also that some travelers had noticed an automobile similar to defendant's car near the area where the body was found. Thereafter, on January 28, officers questioned defendant at his home in the presence of his wife. He was cooperative and agreed to take a lie detector test. The officers were interested in firearms because the girl had been shot, and on inquiry the defendant showed the officers three guns which he owned.
A few days later, defendant was called by officers to go to Concord to take the lie detector test. He was kept in jail overnight but released the next day. On the evening defendant was in Concord, some other officers went to the Coolidge home and told defendant's wife he was in serious trouble. They asked her about clothing defendant might have worn the night the girl disappeared and also about his guns. She expressed the view that they had nothing to hide and gave the officers such clothing as her husband probably wore on that evening, and also turned over four guns owned by the defendant.
During the next two and one-half weeks the police worked on the case, and on February 19 they had a warrant for the arrest of the defendant issued, and also obtained a search warrant for his automobile. The search warrant was issued by the State's Attorney General, who was also the Justice of the Peace. Defendant was arrested at his home and the defendant's automobile was seized under the search warrant. It was parked in the driveway of the home and the officers towed it from there to police headquarters where an extensive search was made.
*511 In examining the car the officers took vacuum sweepings, including particles of gun powder, which were examined and analyzed. At the trial this evidence was offered in an attempt to show by microscopic analysis a high probability that the deceased girl had been in defendant's car. Motions to suppress this evidence were overruled.
Defendant was convicted and the judgment was affirmed by the Supreme Court of New Hampshire. On certiorari, after holding that the search warrant was invalid because not issued by a disinterested officer, the judgment was reversed and the case was remanded to the Supreme Court of New Hampshire for further proceedings consistent with the opinion of the United States Supreme Court. Certain sections of the principal opinion by Mr. Justice Stewart in which he discussed at length and rejected three theories advanced by the State to bring the case within one of the exceptions to the requirement of a search warrant were concurred in by only three other justices. These three points were that the search of the automobile was incident to a valid arrest of the defendant, that the factual situation authorized a warrantless search of the car at the police station under Chambers, and that the car itself was an instrumentality of the crime and hence seizable under the plain view doctrine.
The fact that only four of the nine justices concurred in the foregoing sections of the opinion makes for a somewhat confusing situation as to just exactly what the case held, but the fact remains that the court did reverse the case and remand it for further proceedings. The situation in Coolidge was summarized thus by Mr. Justice Stewart, 403 U.S. 1. c. 460, 91 S.Ct. 1. c. at 2035:
"In this case, the police had known for some time of the probable role of the Pontiac car in the crime. Coolidge was aware that he was a suspect in the Mason murder, but he had been extremely cooperative throughout the investigation, and there was no indication that he meant to flee. He had already had ample opportunity to destroy any evidence he thought incriminating. There is no suggestion that, on the night in question, the car was being used for any illegal purpose, and it was regularly parked in the driveway of his house. The opportunity for search was thus hardly `fleeting.' The objects that the police are assumed to have had probable cause to search for in the car were neither stolen nor contraband nor dangerous."
We are unable to distinguish the Coolidge case from the one with which we here deal. Here the police knew of the red Corvair from the beginning and knew of its possible connection with the crime. They traced the car and observed it at the home of appellant on the day the body was found. They talked to appellant and his father about the crime. Necessarily, appellant knew that he was a suspect. An opportunity to dispose of the car or destroy any evidence existed if there was an inclination to do that, but there was no evidence of flight by appellant or of an effort to destroy evidence. At the time the car was seized it was parked and locked on a downtown lot regularly rented by appellant's father. The police knew of this parking space belonging to appellant's father because on previous occasions they had helped him start his car on that very lot. The car was not being driven on the highway, as in Chambers, where the court felt that the situation was such that if the officers had not seized the car at that time, it could and probably would have been driven away and subsequently not been available for seizure under a search warrant if obtained. The officers did not claim that the automobile contained any contraband or stolen articles.
In Coolidge, under a remarkably similar factual situation, the United States Supreme Court found no exigent circumstances to support a search and seizure without a valid search warrant. In light of that decision, we are unable to find exigent circumstances in this case to support *512 the warrantless search and seizure. The State's brief argues for a finding of exigent circumstances and for application of the plain view doctrine, but both of those contentions were discussed and rejected in Coolidge, and there is nothing in this case which would justify a different result.
The State also argues that the Corvair was downtown on a parking lot rented by appellant's father, whereas in Coolidge the car was in the driveway at the defendant's home, but we find nothing in that factual difference sufficient to sustain the warrantless search of the Corvair.
Finally, the State claims that since New Hampshire would have permitted a search warrant if properly sought, whereas present Missouri law does not authorize a search warrant in these circumstances, a different result should obtain and the search without a warrant should be permitted. We do not agree. This case probably indicates a need to enlarge, within constitutional limitations, the instances in which a search warrant is obtainable in Missouri, but any deficiency in Missouri law as to when search warrants may be obtained does not and cannot change basic constitutional limitations on warrantless searches.
This court, of course, is bound by the interpretation of the Fourth Amendment to the Constitution of the United States and the limitations it imposes on warrantless searches. Hence, since we conclude that under the doctrine of Coolidge the seizure and subsequent search of the Corvair violated appellant's Fourth Amendment rights, we must and do hold that his motion to quash should have been sustained and the evidence obtained by such search should have been excluded.
Since we cannot be certain whether on remand the State may be able to offer additional evidence not obtained by the search which would sustain a conviction of the appellant, we reverse and remand for further proceedings consistent with this opinion.
All concur except DONNELLY, J., who concurs in result in separate concurring opinion filed.
DONNELLY, Judge (concurring).
I concur only in the result for at least two reasons: (1) I do not know to what extent, if at all, the case of Coolidge vs. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, has affected the "supreme law of the land" relating to searches and seizures under the Fourth Amendment; and (2) I wish to reserve the right to consider the question, when raised and briefed in this Court, whether the Exclusionary Rule of Weeks vs. United States, 232 U.S. 383, should be applied in Missouri to proceedings within the Juvenile Court. (See In re Marsh, 40 Ill.2d 53, 237 N.E.2d 529; and In re Martinez, 83 Cal.Rptr. 382, 463 P.2d 734.)
NOTES
[1] An extensive and interesting analysis of the Jones case as it relates to standing appears in a note "Standing To Object To An Unlawful Search And Seizure," Washington University Law Quarterly, Vol. 1965, No. 4, p. 488.