STATE of Missouri,
Plaintiff–Respondent,

v.

Estasio ORSO, Defendant–Appellant.

No. 56550.

Missouri Court of Appeals,
Eastern District,
Division Two.

April 17, 1990.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 16, 1990.

Application to Transfer Denied
June 19, 1990.

Deborah B. Wafer, Asst. Public Defender, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Frank A. Jung, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

KAROHL, Judge.

Defendant, Estasio Orso, was convicted by a jury of second degree murder and armed criminal action. He was sentenced by the court as a prior and persistent offender to two terms of life imprisonment to be served consecutively.

On appeal defendant contends the trial court erred in: (1) admitting evidence that was seized in a warrantless search of his residence, including testimony of incriminating statements made by defendant; (2) admitting photographs of the deceased that were prejudicial, inflammatory and cumulative outweighing any probative value; and (3) failing to strike a venireperson for cause thus depriving defendant of his full rights of peremptory challenges.

The victim, Delores Robinson, was found by the police on December 15, 1987 in her home which she shared with defendant, her grandson. The events leading up to the discovery of the victim are as follows. Mrs. Robinson invited defendant to live with her after her son, defendant's father, died in September 1987. Concerns regarding the welfare of Mrs. Robinson were first expressed by Sister Delores Shea, a Catholic nun. Sister Shea's duties included "visiting the sick and 'shut-ins' " for the parish.

She was concerned because Mrs. Robinson was an "eighty year old female living alone who wasn't responding to visitors or telephone calls." Mrs. Robinson was unable to attend church because she was ill and "full of arthritis." On December 8, 1987 Sister Shea heard from a church worker providing in-home pastoral services to Mrs. Robinson. The church worker was unable to get a response from Mrs. Robinson when she went to her home. Sister Shea made several unsuccessful attempts to contact Mrs. Robinson by telephone and in person from December 9 to December 11. On December 11 and December 13, Sister Shea went to Mrs. Robinson's house during daytime hours. She found the drapes were drawn. This was unusual because Mrs. Robinson normally kept them open. On December 12 or 13, Sister Shea phoned the Director of Meals on Wheels who informed her delivery of meals had been cancelled. Additionally, Sister Shea called local hospitals to determine if Mrs. Robinson had been admitted. She also telephoned a friend of Mrs. Robinson who did not know of Mrs. Robinson's whereabouts. Sister Shea then contacted the police and made a Hot Line call seeking assistance. On December 14, 1987, Sister Shea called Carmen Orso, Mrs. Robinson's granddaughter and defendant's half sister, to report that she had been unable to make contact with Mrs. Robinson.

Sgt. Beverly Noble, a Supervisor with the St. Louis Police Department, Seventh District, testified she received a phone call from Ms. Orso on December 14, 1987[1]. Ms. Orso "expressed a concern about the well being of her grandmother. She said she had been trying to contact her for "about a week and there was no answer. She said she suspected foul play." Although Ms. Orso told Sgt. Noble she didn't know defendant, her half brother, "her grandmother had befriended him and had permitted him to live in the house with her."

With this information, Sgts. Noble and Buschard and Officer Harry Fitzgerald

went to Mrs. Robinson's home and "conducted an investigation there on December 14." Sgt. Noble testified there was no response to her knock on the door. She "looked through the mail slot . . . [and] the light was on." There was no accumulation of mail, "no foul smell coming from the place," and "no signs of forced entry. In fact, there was snow on the ground. There was [sic] no footsteps or any car tracks or anything at the house."

After inspecting the house, Sgts. Noble and Buschard and Officer Fitzgerald interviewed two neighbors. Neither neighbor had seen Mrs. Robinson recently. One neighbor "thought that she was sick and staying with a friend."

Sgt. Noble called Ms. Orso:

I didn't feel comfortable—because she wanted me to force our [sic] way into the house to check on her grandmother, and I told her that under the circumstances of what the neighbors were saying and with the investigation there at the house I didn't feel comfortable in forcing the door in, that I wanted to conduct a more thorough investigation first before we went into the house.

On December 15, 1987, Sgt. Noble contacted Sister Shea for additional information. Sister Shea told Sgt. Noble she had contacted Mrs. Robinson's physician and local hospitals. Neither knew of Mrs. Robinson's whereabouts. Sister Shea and Sgt. Noble then drove to the house of a friend of Mrs. Robinson's but were unable to make contact. Sgt. Noble called Ms. Orso agreeing to enter the house if Ms. Orso would authorize the entry and make arrangements to board up the house. Sgt. Noble testified this investigatory procedure, accompanied with proper authorization to enter, is an accepted procedure for nonresponsive elderly citizens. Three additional policemen and the fire department were called to assist Sgt. Noble in entering the premises.

---

1. All communications and directions between the police and Carmen Orso were by telephone. She resided in Portland, Oregon. She was not available to go to Mrs. Robinson's home and determine if an emergency existed.

Sgt. Stevenson and Officers Newsome and Gardner arrived at 2:10 p.m. on December 15. This time Mrs. Robinson's car was parked in front of the house. When Sgt. Noble peeked through the mail slot the light was off. No other changes were noted since the previous investigation on December 14, 1987. Sgt. Noble knocked on the door and defendant answered. In response to questions regarding the whereabouts of Mrs. Robinson, defendant stated she was at his sister's house about three blocks away. He didn't know the specific address or phone number.

Defendant asked why the police were making this inquiry. Sgt. Noble told him she had been in contact with his half sister, Ms. Orso who "was concerned because she had been trying to get in touch with her grandmother." Defendant volunteered to call Ms. Orso and tell her that Mrs. Robinson was with his sister. Sgt. Noble told defendant "that wasn't good enough, that since we had gotten a complaint we needed to see her for ourselves to make sure she was okay." Defendant agreed to accompany the police to his sister's house after he got his jacket. During this interaction defendant was standing inside the doorway speaking through a partly open door. When defendant reentered the house to get his jacket, he closed the door.

Sgt. Noble ran a trace on the automobile license plate noting defendant had not yet come out of the house. She knocked on the door while another officer observed, "I think we hear him talking on the telephone." Defendant came to the door, closed and locked it saying his grandmother had "gone shopping with my sister, they're not at home." When defendant was asked how he obtained this information he said he had just called his sister's house. Sgt. Noble found this suspicious because defendant had previously told them he didn't remember the phone number.

Sgt. Noble persisted. "We want to go in the house and check to see if your grandmother is there." Sgt. Noble testified defendant "was breathing very, very hard. It was very noticeable. And he seemed kind of jumpy and nervous." Again, Sgt. Noble said she wanted to go into the house. Defendant replied "No." Sgt. Noble explained Ms. Orso was concerned and they wanted to check the house. Defendant said, "Well, you need a search warrant." Sgt. Noble asserted, "We don't need a search warrant. It's not your house; it's your grandmother's house. That's all we want to do is make sure she's okay." Defendant "looked over, he saw the fire truck pulling up and he stuck the key in the door and then he looked back over his shoulders again. And when he did that, I [Sgt. Noble] just turned the key and then we went in."

While Sgt. Noble stayed with defendant the other officers searched the first floor, the second floor where the bedrooms were located and finally, the basement where Officer Newsome discovered Mrs. Robinson. Upon discovering the body, Sgt. Noble "put cuffs on Estasio and had him sit down in the living room and we waited for Homicide to respond." Defendant was not advised of his *Miranda* rights. The police had not interrogated defendant. Sgt. Noble further testified she had not suspected "foul play" prior to the body being found. Officers Herbert Gardner's and Kenneth Newsome's testimony confirmed Sgt. Noble's recollection of the events leading up to the warrantless entry and search.

Sgt. Gary Poelling, St. Louis Police Department, Homicide Division testified to the events after the discovery of the body. Sgt. Poelling said defendant was "being detained ... until additional information can be gathered to find out exactly what has transpired inside the house." Defendant was moved by Sgt. Poelling from the living room to Mrs. Robinson's bedroom on the second floor. Sgt. Poelling did not tell defendant he didn't have to talk if he didn't want to until "he started talking in reference to arguments and disagreements that he had had with his grandmother...." He was then given his *Miranda* rights.

Defendant proceeded to tell Sgt. Poelling of an argument "some prior weeks back" over an open window in the house. Defendant said his grandmother had called the

police and he believed she was "becoming somewhat senile, or paranoid . . ." explaining why Mrs. Robinson kept a pistol in her nightstand drawer. Sgt. Poelling "opened up the drawer of the nightstand and recovered a brown holster. There was no weapon in there." Defendant said he had placed the pistol in the trunk of Mrs. Robinson's automobile prior to the day of her death. Sgt. Poelling testified defendant consented to the search of the car and a .32 automatic was found. Further questioning elicited a statement from defendant denying the pistol played "any part in the role of his grandmother's death." Defendant said there were two rifles in the house and told Sgt. Poelling where they were. He said only one of the rifles was involved with his grandmother's death.

After Sgt. Poelling found a .22 rifle in defendant's bedroom closet, defendant recounted the events of the evening his grandmother died, either December 3, 4 or 5, 1987. At approximately 5:00 or 5:30 p.m. Mrs. Robinson came home from shopping. She and defendant had an argument during which she had the pistol in her possession and he had the rifle. Defendant stated he "wanted to scare her" and "he shot the rifle one time and it struck her and she fell to the ground" in the dining room. Defendant was then taken downstairs to the dining room to reenact the shooting.

Approximately four and one half hours later, defendant was taken to the Homicide Office at police headquarters, placed in an interview room and asked to make a tape recording of the statements made in the house. When Sgt. Poelling re-read *Miranda* rights to defendant he requested an attorney. Questioning ceased.

At trial, defendant's version of the facts contradicted those made to the police officers on December 15, 1987. Defendant said approximately one week before the shooting, he put the two rifles in the basement as suggested by his cousin, a police officer. Defendant moved the rifles and pistol due to an incident in November, 1987. Mrs. Robinson had called the police because she and defendant were arguing about whether or not defendant was open-ing windows and letting in cold air. Defendant testified the police told him to "watch out for her because she was probably affected by my father's funeral."

Defendant denied telling Sgt. Poelling he shot his grandmother in the dining room following an argument. On the day of the shooting defendant stated Mrs. Robinson came home and went into the basement looking for a rifle. When defendant entered the basement, Mrs. Robinson had already found the rifles in a storage area. She picked up a rifle. Defendant "tried to take it away from her. She got upset, or was upset already, and she just kept saying that it was her house and she knew what she was doing . . . I just had ahold of it . . . I just thought it would subside. . . ."

In addition to defendant's statements and the seizure of the rifles, the police found a cartridge casing in defendant's bedroom. It was from the rifle used in the shooting. Photographs were taken of the two rifles and .32 pistol, a clip and cartridge casing, various areas of the house, and the victim's body.

Defendant tacitly concedes the state made a submissible case. Thus, the first question before us is whether the court erred in overruling defendant's motion to suppress evidence which proved the charge. Defendant filed a motion to suppress and timely objected to admission of the evidence seized. He asserts the physical evidence and his statements were the result of an illegal search and seizure of his home as the police entered his residence without a warrant or his consent in violation of the Fourth Amendment.

■ The trial court's ruling on the motion to suppress evidence, with deference to the trial court's opportunity to judge the credibility of the witnesses, was supported by substantial evidence. *State v. Johns,* 679 S.W.2d 253, 261 (Mo. banc 1984) *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). Although it is the state's burden at a suppression hearing to show by a preponderance of the evidence that the motion should be overruled, it is the defendant's burden to establish his own standing to assert violation of Fourth

Amendment rights. *Rakas v. Illinois,* 439 U.S. 128, 131, 99 S.Ct. 421, 424, 58 L.Ed.2d 387 (1978). *State v. Arnold,* 566 S.W.2d 185, 186–87 (Mo. banc 1978).

█ The state argues "the court [correctly] held that any expectation which appellant may have had terminated upon the death of his grandmother who had allowed him to stay at the residence over the objection of the rightful owner." The court did not expressly overrule the motion to suppress because of the absence of standing. It observed:

THE COURT: I don't know what the state of the title is. I haven't done enough work in the probate court. And we might have to have the will. But the title to the property must have been vested in the estate or somewhere else perhaps after the lady's death and this entrance into this property occurred. He obviously has no lease and he paid no rent. Whether under property law that license terminated with her death is a good question. It would take some research. But it may well be that with her death, it terminated any permission she had given either to use the car or anything else.

However, the Missouri Supreme Court has expressly rejected property concepts as procedural barriers to challenge search and seizure. The Court adopted a protection of privacy test for determining standing. *In re J.R.M.,* 487 S.W.2d 502, 505 (Mo. banc 1972). In so doing, the Missouri Court follows the United States Supreme Court decisions of *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) and *Combs v. United States,* 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308 (1972).

Analysis of these recent decisions indicates that no simple, well-defined, all-encompassing test for determining standing is articulated. *Jones* signalled the end of a requirement that property or possessory rights in the premises or property be shown. It assured standing to one legitimately on the premises as well as to one who otherwise might be required to face the dilemma of claiming ownership of property which might convict him.

*In re J.R.M.* at 508.

*In re J.R.M.* was explained by the Missouri Supreme Court in *State v. McCrary,* 621 S.W.2d 266 (Mo. banc 1981) to stand for the adoption of legitimate expectation of privacy in the place or thing being searched as set forth in *Rakas. McCrary* at 272–273. "We now hold that the 'reasonable expectation' test ... adopted by this court in *In re J.R.M.* is identical to the 'legitimate expectation of privacy' test adopted by the United States Supreme Court." *Id.* at 273. Distinctions between lessee, licensee, invitee and guest have been eliminated.

Defendant had a "legitimate expectation of privacy" in the home in which he lived. He had permission of the owner, Mrs. Robinson, to use and live in the house. He had a key to the house, a separate bedroom and kept his belongings in the house. There is no evidence in the record to indicate Mrs. Robinson asked defendant to vacate the premises at any time. Defendant was also present at the time the officers made their search. We therefore conclude defendant has standing. *In re J.R.M.,* quoting *Jones* at 505.

█ The state admits defendant did not consent to the warrantless search nor did the police have probable cause to believe defendant had committed a crime. The facts support such a finding. Nevertheless, the state asserts Ms. Orso's permission for the police to enter her grandmother's home was valid. The record would support a finding Ms. Orso was an owner in joint tenancy with Mrs. Robinson. Even so, she was not a resident of the house and had no authority to consent to the search.

█ The consent of one who possesses common authority over premises or effects may be valid against the absent, nonconsenting person with whom that authority is shared. *State v. Johns,* 679 S.W.2d 253,

262 (Mo. banc 1984) citing *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). Common authority is the mutual use of property generally having joint access or control for most purposes so that any of the cohabitants has the right to allow inspection in his own right. In such a situation, other cohabitants assume "the risk that one of their number might permit the common area to be searched." *Matlock* at 171, 94 S.Ct. at 993. Ms. Orso had no requisite degree of possession, cohabitation or common authority over defendant's house. Neither *Johns* nor *Matlock* apply to such facts.

"A search conducted without a warrant is unreasonable under the Fourth Amendment unless permitted because of specifically established and well delineated exceptions." *Bonner v. State*, 765 S.W.2d 286, 287 (Mo.App.1988) citing *Katz*, 389 U.S. at 357, 88 S.Ct. at 514.

The trial court in the present case bypassed the standing issue. It relied upon the doctrines of exigent circumstances and inevitable discovery to uphold the warrantless search. On the issue of the existence of a medical emergency justifying a warrantless entry, our Missouri Supreme Court has held a search in response to a need for help is an exception to the warrant requirement. *State v. Epperson*, 571 S.W.2d 260 (Mo. banc 1978). The significant facts in *Epperson* were: defendant's wife and children had been missing for several days; defendant had given false and inconsistent explanations for their absence; defendant's manner was nervous and unusual; an odor had been detected in the house; and the defendant disappeared with no explanation before the police arrived. The police officer on duty did not know whether the family had left town or were in immediate need of help to prevent death. *Id.* at 265. From these facts, the court in applying an objective standard held the officers' entry was justified because of "the *probability* that someone in the house *might* be injured and need medical aid." *Id.* (Our emphasis). In dicta, the *Epperson* court indicated that the objective standard is sufficient when officers act in good faith in a search for a missing person in unusual circumstances.

In *State v. Butler*, 676 S.W.2d 809, 811 (Mo. banc 1984) the warrantless entry into the Butler home was justified by an emergency phone "call of the victim that he had just been shot by his wife in their home." The entry was upheld as a medical emergency to aid the wounded caller, after they saw him lying on the floor. Additionally, the victim as co-tenant of the house opened the locked door for the police. *Id.* at 812 citing *State v. Timmons*, 574 S.W.2d 950, 954 (Mo.App.1978).

*State v. Turner*, 716 S.W.2d 462 (Mo. App.1986) was also a situation of a known emergency where the defendant shot his son in front of defendant's home. A neighbor informed the police that defendant's daughter had been living with defendant and was unaccounted for at the time of the shooting. Applying an objective standard, this situation was held to have justified a "reasonable belief that an additional victim may have been in the house and in need of immediate aid." An emergency situation existed falling squarely within the exigent circumstance exception to the warrant requirement. *Id.* at 465.

*State v. Ramsey*, 665 S.W.2d 72 (Mo. App.1984) followed *Epperson* in a case factually similar to the present case. However, in *Ramsey* the defendant was not at the house when the police entered and searched. In *Ramsey*, defendant lived with his mother in her house. Defendant called a co-worker of Mrs. Ramsey's to report she would not be at work due to a medical appointment. The co-worker called Mrs. Ramsey's physician and local hospitals and discovered she neither made an appointment nor was admitted to a hospital. Mrs. Ramsey did not respond to knocks and ringing at her door. Three days of newspapers had accumulated. Identifying the "need for help" or "emergency" exception as set forth in *Epperson*, the court stated: "Suspecting a crime or smelling decaying flesh are not essential to the entry. The question is whether there was a reasonable basis to believe that a medical emergency existed."

■ Although there are similarities between the instant case and those discussed, this case is one of first impression because defendant was present and denied entry without a warrant. In the prior cases, the defendant was either not in the home to object to a search or a crime had been committed with evidence that victims might be in the home. However, there are numerous facts to support a reasonable belief that a medical emergency existed. Here, Mrs. Robinson had been missing for approximately seven days and had failed to keep her regular visits with the church worker who brought her Communion; she failed to respond to telephone calls and visits from Sister Shea; the director and delivery person from Meals on Wheels reported the service cancelled; she failed to answer phone calls from her granddaughter; curtains which were regularly open during daytime hours were observed drawn by Sister Shea; she had not seen her physician or been admitted to any local hospitals; and she was elderly, not very mobile and had a heart condition.

These facts support an objective reasonableness in concluding a "need for help" probably existed. Defendant did not give the police any information which overcame the objective reasonableness that Mrs. Robinson might be in her home in need of medical assistance. His conduct and equivocal statements did not overcome the perceived need; they reinforced it.

Objective facts would not be sufficient if the police officer's subjective motives were in bad faith. Here, the police officers testified they did not suspect a crime had been committed by defendant. They believed they had consent from the absent owner. Acting on concerns of a relative and persons providing services to the elderly, the police intended to enter the home for only one purpose, to determine if Mrs. Robinson was in need of medical assistance. Defendant did not clearly overcome the natural conclusion to be drawn by a litany of facts suggesting a probable need for help. His conduct and equivocal and inconsistent statements in this case reinforced, rather than removed, the factual basis for perceiving "need for help" as a justification for entry.

Sgt. Noble at all times considered the probability that Mrs. Robinson might be in the house and in need of medical assistance. We find the decisions in *Epperson* and *Ramsey* controlling and decisive on the present facts. The entry without a warrant was within a recognized exception to enforcing Fourth Amendment protection against unlawful search and seizure. We recognize this holding extends application of *Epperson* because defendant was present.

Defendant also argues under this assignment of error the police did not have probable cause to detain him and therefore, any statements made during detention were a product of an illegal detention. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Fourth and Fifth Amendment rights may be implicated when a person's freedom of movement is restrained by physical force or a show of authority. Under the Fourth Amendment, the police must demonstrate "probable cause" to detain or arrest to satisfy the prohibition against "unreasonable" searches and seizures (*Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959)); otherwise, the exclusionary rule will operate to exclude the illegally obtained evidence. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Whether or not labeled an "arrest," a "detention for custodial interrogation ... intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Dunaway*, 442 U.S. at 216, 99 S.Ct. at 2258.

■ Even assuming the original detention by Sgt. Noble was without probable cause, the statements made prior to defendant's arrest were not custodial. An officer may briefly forego the mandates of *Miranda* in order to insure the safety of himself and others. *State v. Turner*, 716 S.W.2d 462, 466 (Mo.App.1986) citing *New York v. Quarles*, 467 U.S. 649, 655–56, 104

S.Ct. 2626, 2631, 81 L.Ed.2d 550 (1984). Upon arriving at the scene, the officers main concern was to locate Mrs. Robinson and provide assistance if needed. The questions preceding and immediately following the discovery of her body were brief and limited in scope. After defendant volunteered he had argued with the victim, Sgt. Poelling informed defendant of his *Miranda* rights. We find no Fourth Amendment violation for the reason that the detention and investigation related only to the search for Mrs. Robinson and officer safety. No interrogation occurred until after the body was found, thereafter there was probable cause. No Fifth Amendment violation occurred because *Miranda* warnings were timely. Defendant's first claim of error is denied.[2]

Defendant's next assignment of error was the admission of twenty-one photographs by the state because they were "highly prejudicial, inflammatory and cumulative" outweighed by any probative value.

■■■ The trial court has broad discretion in the admission of photographs and we find no abuse of that discretion here. *State v. Weekly*, 621 S.W.2d 256, 260 (Mo. 1981); *State v. Murray*, 744 S.W.2d 762, 772 (Mo. banc 1988). "Photographs are generally admissible if they are relevant to a material issue." *Murray* at 772. A material issue includes any material element of the state's case. The photographs were relevant to show the scene of the crime, the identity of the victim, and the condition and location of the body. Photographs, although gruesome, may be admitted for these purposes. *State v. Gardner*, 618 S.W.2d 40, 41 (Mo.1981). Photographs of Mrs. Robinson's decomposed clothing were relevant to the condition of her body. The autopsy photographs are also relevant because they show the cause and location of the gunshot wound and could have enabled the jury to better understand the testimony of the medical examiner. They were also relevant in light of the testimony of how

the shooting occurred and subsequent testimony of defendant about the shooting.

Insofar as the photographs are shocking or gruesome, it is because the crime is of that sort. *Murray* at 772. Even though the photographs may be inflammatory, they are not so unusual that the extent of prejudice overrides the photographs' probative value. The photographs are not more inflammatory than other photographs which accurately show the body of a person who dies from gunshot wounds left to decompose in a basement. Thus, the scene depicted was not unusual and the prejudice resulting from the admission of the photographs did not exceed their probative value. *Id.*

■■■ Defendant's final assignment of error challenges the trial court's rulings with respect to a prospective juror. We find no error. Principles applicable to jury selection are well established. An accused must be provided a full panel of qualified venirepersons from which to make the statutory number of peremptory challenges. *State v. Engleman*, 634 S.W.2d 466, 471 (Mo.1982). In determining the qualifications of individual venirepersons, the trial court has broad discretion. *State v. Hopkins*, 687 S.W.2d 188, 189 (Mo. banc 1985). A challenge for cause to a venireperson must be judged on its facts. *State v. Stewart*, 692 S.W.2d 295, 298 (Mo. banc 1985). The trial court's decision with respect to such a challenge is made on the basis of the entire examination, not merely a single response. *Murray*, at 769. Furthermore, that decision necessarily involves a judgment based upon observation of a prospective juror's demeanor and, considering that observation, an evaluation and interpretation of his or her responses as they relate to whether he or she would be fair and impartial if chosen as a juror. *State v. Smith*, 649 S.W.2d 417, 422 (Mo. banc 1983). Because the trial court can observe the demeanor and hear the responses of venirepersons, we resolve doubts to its finding in its favor. *Id.* Accordingly, the

2. We do not reach and do not decide if the inevitable discovery doctrine applies to evidence found in defendant's home.

law attaches a strong presumption that the jury tendered at the outset of the trial has been properly selected. *State v. Bynum,* 680 S.W.2d 156, 160 (Mo. banc 1984).

 During voir dire, defense counsel asked the jury "How many of you are going to expect me to prove Estasio not guilty?" Venirewoman Dilworth (Dilworth) responded, "Yes, I would. Somewhat." She also expected defense counsel to "give me some reasons as to why I would not find him guilty." When defense counsel asked if Dilworth would require Estasio to testify she said, "Not necessarily" but, she would require "some type of evidence." When asked if she understood "the law ... we've talked about, this little obligation, this little package, goes with [the prosecutor], Dilworth said, "Right." She responded in the affirmative to understanding the burden of proof and the state's obligation to prove guilt; not the defendant's obligation to prove himself not guilty. Yet, when defense counsel stated, "... I'm still concerned by your first statement that you'd require me to prove him not guilty," Dilworth responded, "I would require you to ask questions of Mr. Warzycki's witnesses or whatever ... I'd have to make up my decision from what goes on in the courtroom here."

Defense counsel moved to strike Dilworth for cause, arguing she "would be shifting the burden of proof to the defense...." The prosecutor countered that Dilworth had said she would have no problem enforcing the rules given by the court at the end of trial and requested an opportunity to clarify the confusion by reopening the questioning. The prosecutor then asked Dilworth and three other jurors in detail whether they understood the state's burden of proof emphasizing the defense had no burden. When asked if she would follow the law, as explained, and apply the test of beyond a reasonable doubt, Dilworth responded, "Yes, I would." The trial court then overruled defense counsel's motion to strike.

The voir dire examination of Dilworth reveals no clear abuse of discretion by the trial court. We cannot say the trial court erred in choosing to believe that Dilworth could follow instructions and enforce the burden of proof required of the state. Point denied.

We find no error. We affirm.

PUDLOWSKI, P.J., and CRANDALL, J., concur.