**STATE of Missouri, Respondent,**

v.

**Robert Anthony MURRAY, Appellant.**

No. 69152.

Supreme Court of Missouri,
En Banc.

Feb. 17, 1988.

Rehearing Denied March 15, 1988.

Holly G. Simons, Asst. Public Defender, St. Louis, for appellant.

William L. Webster, Atty. Gen., Deborah L. Ground, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Chief Justice.

Defendant Robert Anthony (Tony) Murray was convicted of two counts of first degree murder, *Section 565.020, RSMo 1986,* for the execution-style killing of two robbery victims, Jeffrey Jackson and Craig Stewart, and sentenced to death on both counts. The jury found the following aggravating circumstances: (1) each murder was committed while the defendant was engaged in the commission of another unlawful homicide, *Section 565.032.2(2), RSMo 1986;* (2) each murder involved torture or depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman, *Section 565.032.2(7);* and (3) each murder was committed while the defendant was engaged in the perpetration or the attempt to perpetrate the felony of robbery, *Section 565.-032.2(11).* Affirmed.

Defendant does not question the sufficiency of the evidence to support his conviction. It is helpful, however, to set forth the facts and reasonable inferences arising therefrom which the jury reasonably could have found in arriving at their verdict, ignoring contrary evidence and inferences. *See State v. Griffin,* 662 S.W.2d 854, 855

(Mo. banc 1983), *cert. denied,* 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 153 (1984).

Sometime after 11:00 p.m. on December 5, 1985, Claudia Hennings and Gladys Nutall arrived at Jeffrey Jackson's apartment at 2331 Park Avenue in the city of St. Louis. Already present at the apartment were Jackson and his friend Craig Stewart. Jackson and Stewart were cab drivers for the Laclede Cab Company.

After Hennings and Nutall arrived at the apartment, they, along with Jackson and Stewart, drank and smoked marijuana and cocaine while watching television. About 12:05 a.m., William Murray, the defendant's older brother, came by Jackson's apartment and talked privately with Jackson in the bedroom. Hennings had known William for eight years and considered him to be her "best friend." After concluding his discussion with Jackson, William left the apartment.

He returned, however, a half hour later, at which time he pulled out a pistol and said: "Everybody get on the floor. This is a holdup." While Hennings, Nutall, Jackson, and Stewart were getting down on the floor, the defendant and a third individual entered the apartment. The defendant also had a gun and wore a ski mask. Hennings, who had known the defendant for as long as she had known his brother William, recognized the defendant's voice and told him to take the mask off because she knew who he was. The defendant complied by rolling up his mask.

William asked Jackson if he had "anything else" in the house and Jackson told him to look in his dresser drawer in the bedroom. While William went into the bedroom to search the dresser, the defendant held a gun on the prostrate victims. The defendant continued covering the victims while William and the third individual methodically searched the rest of the apartment. During the search, William constantly asked for money and guns. In furtherance of the quest for money, William took Nutall's purse and Stewart's wallet and the defendant took Hennings' purse and Jackson's wallet. The wallets and the contents of the purses were dumped into a

pillow case. Unhappy with the loot they had found, the three men kept saying "it's not enough," and that they were not satisfied.

Eventually, William asked Jackson if anyone was coming to the apartment that night. Jackson replied that Tracy Adams, another Laclede Cab driver, was supposed to come at about 3:15 a.m. to take him to work. When asked if Adams would have any money or guns with him, Jackson said he did not know. Apparently deciding that Adams might have something they wanted, the assailants waited in the apartment for about three hours for him to arrive while the victims remained on the floor.

Towards the end of the three hour wait, William Murray walked up to Nutall, who was still lying on the floor, and kicked her in the side. He then told her to come into the kitchen with him. After they entered the kitchen, William raped her. During this attack, Nutall saw defendant looking in from the living room at her and William. Also during the time of the attack on Nutall, the defendant sexually assaulted Hennings in the living room by rubbing her genital area. After William had finished with Nutall, he ordered her back into the living room.

A short time later, the defendant and William began binding Jackson and Stewart. Jackson's hands were tied behind his back with shoe laces and Stewart's hands were tied behind his back with a sock. A shirt was tied around Jackson's head to serve as a gag and blindfold. Stewart was also gagged and blindfolded by a shirt, as well as other articles of clothing, tied around his head. The defendant then went into the kitchen and returned with a butcher knife and some steak knives. Jackson and Stewart were then taken into the kitchen one at a time. After placing the two men on their knees, the defendant at first, and then William began hitting them. While beating Jackson and Stewart, the defendant and William kept saying: "This ain't enough, man. This ain't enough. You all got something else here?" Then the defendant and William took the knives and began stabbing into the floor beside

Jackson and Stewart, trying to scare them more.

Viewing the assault going on in the kitchen, Hennings got up off the floor and tried to jump out a window. The defendant, however, caught her and stopped her, telling her not to try it again or he would cut her throat. Hennings was ordered back on the floor and the defendant turned to go back into the kitchen. Hennings moved as if to lie back on the floor, but when the defendant's back was turned, she ran into the bedroom, slamming the door closed behind her. Hennings then threw her body through the closed second floor bedroom window and landed outside on the grass. After hitting the ground, Hennings heard gunshots. She fled down a street, screaming, went to a house, and called the police.

After Hennings' dash into the bedroom, one of the assailants ran into the bedroom, said, "she is gone," and returned to the kitchen where his confederates had remained. Seeing that she was alone in the living room, Nutall looked up and into the kitchen and saw the defendant hold Stewart up and shoot him in the back. Nutall immediately got up and ran out the door of the apartment. She ran part way and fell part way down the stairs to the door of the building. She then ran to a nearby Kroger store where she told a security guard that men had been shot at the apartment on Park Avenue.

When police officers responded to Hennings' call, she gave them the names of the defendant and William Murray as two of the assailants. She also provided descriptions of the two men. The police also responded to a call made by the security guard to whom Nutall had gone to after escaping from the apartment. Both women were returned to the apartment and the police discovered the dead bodies of Jeffrey Jackson and Craig Stewart in the kitchen. Each man had been shot twice in the back.

At defendant's trial a deputy medical examiner for the City of St. Louis testified that both Jackson and Stewart died as the result of gunshot wounds. Jackson had three bullet wounds. One was in the left side of his chest under his arm. The bullet that entered there went through the left lung and through the heart. The second wound was in the right side of Jackson's back, about midway between his neck and his waist. The bullet that entered there went through Jackson's right lung. The third wound was a grazing wound on the surface of the upper part of Jackson's left arm. This wound may or may not have been caused by the same bullet that entered the left side of Jackson's chest. Stewart had two bullet wounds, both on the left side of the back. The bullet causing the lower wound went through the left lung and passed through the heart. The bullet causing the upper and more central wound shattered against one of the vertebrae of Stewart's spine. Gunpowder residue found on the clothing of Jackson and Stewart and around Jackson's arm wound indicated that all the shots were fired within two feet of the bodies of the victims. The deputy medical examiner also testified that he found marks on the wrists of both men which had been caused by their bindings.

Three of the four bullets causing the chest and back wounds were recovered from the victims' bodies. Ballistics tests showed that these three bullets were fired from the same weapon. Pieces of the bullet that shattered against Stewart's vertebrae, were also recovered. Tests to determine whether this bullet was fired from the same weapon as the other three were inconclusive due to its fragmented nature.

Based upon the information from Claudia Hennings that the defendant was one of the assailants, the police learned where he lived and then, on the day after the murders of Jackson and Stewart, police officers went to his home and arrested him. After being advised of his rights, the defendant at first denied his presence at the scene of the crime. Later that night, Gladys Nutall viewed a lineup and positively identified the defendant as the man she saw fire the shot into Craig Stewart's back. Upon being re-advised of his rights and being informed that he had been identified from the lineup, the defendant admitted that he had gone to

Jackson's Park Avenue apartment, but said he left before anyone was killed. The next day, after he was again advised of his rights, the defendant stated: "I didn't gag nobody, shoot nobody, tie nobody up or kill anybody." At the time the defendant said this no police officer had yet mentioned to him that the victims had been bound and gagged.

Defendant's first two assignments of error concern the striking of venirepersons for cause because of their views on the death penalty. A venireperson may be excused for cause because of his views on capital punishment when those views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). Thus, there are grounds to excuse a venireperson for cause in a capital case if his views on the death penalty would prevent or substantially impair him from realistically considering either a death sentence or a life sentence. A juror, under Missouri law, must be able to consider both alternatives. *See State v. Smith*, 649 S.W.2d 417, 425 (Mo. banc), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983).

[2] This standard does not require that a venireperson's bias be proved with unmistakable clarity. *Wainwright*, 469 U.S. at 424, 105 S.Ct. at 852. Despite an ambiguous printed record, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... [D]eference must be paid to the trial judge who sees and hears the juror." *Id.* at 425–26, 105 S.Ct. at 852–53.

Defendant's first contention with respect to the striking of venirepersons because of their views on capital punishment is that three venirepersons were improperly so excused. Each of these three was excused on the grounds that he or she personally could not consider imposing the death penalty. A review of the record indicates, though, that each of the three was also inconsistent in varying degrees in this position.

Venireperson Catherine Farroll initially stated that she could consider the full range of punishment. She later, however, approached the court and counsel and stated that after much reflection she decided she could not consider death as a punishment. Given this unprompted confession from Farroll, the court was justified in striking her for cause on the grounds that she would be unable to perform her duties as a juror in accordance with the instructions.

In the cases of the other two venirepersons, Sam Allen and Lee Evans, each at first told the prosecutor that they could not impose the death penalty, but then, when questioned by the defense counsel, stated that they could consider both death and life sentences in the event defendant was found guilty of first degree murder. In efforts to pin Allen and Evans down to one position, both men had their equivocation brought to their attention and they were again asked whether they could consider the full range of punishment. Both replied that they could not. The trial court did not abuse its discretion in striking both Allen and Evans for cause. The court was warranted in relying on their final answers that they could not consider the death penalty because these answers were given after it was pointed out to Allen and Evans that their previous answers were inconsistent.

The exclusion of Farroll, Allen, and Evans was permissible under *Wainwright* because each indicated an inability to follow the law as stated in the instructions.

Defendant's other contention with respect to the striking of venirepersons because of their views on capital punishment is that fourteen venirepersons should have been stricken because each indicated that he or she believed that death was the only appropriate punishment for first degree murder. Defendant's contention fails with respect to venirepersons Eve Ebert, Lillian Nicolai, and Ruby Smith because all three

unequivocally stated that they could consider both death and life sentences.

All the other eleven challenged venirepersons initially stated that they could consider the full range of punishment. Under examination by defense counsel, however, each of the eleven at least arguably retreated from their earlier stand. Some of these venirepersons directly stated to defense counsel that they could consider only the death penalty. In the case of one of these eleven venirepersons, the defense counsel, seeking to resolve the inconsistency in the responses, reiterated that the jury would be instructed that the penalty for first degree murder was either death or life imprisonment. After being reminded of the law the jury was required to follow, this venireperson stated that she would be able to consider both alternative punishments. In the cases of the other ten venirepersons at issue here, the court, recognizing that their answers were inconsistent and that they were becoming confused, broke into the questioning and explained as impartially as possible the duty the jurors would have to follow the court's instructions and to consider both the alternative punishments provided for first degree murder. The court then asked the venirepersons if they could follow the instructions in this case and consider both alternative punishments. Each of the ten venirepersons said he or she could.

 The qualifications of a prospective juror are not determined by a single response, but are made on the basis of the entire examination. *State v. Smith*, 649 S.W.2d 417, 425–26 (Mo. banc), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed. 2d 246 (1983). While these eleven challenged venirepersons did equivocate as to their ability to consider both death and life sentences, they did, in the end, state that they could consider both alternatives. The trial court did not abuse its discretion under *Wainwright* in refusing to strike them on the basis of their views on capital punishment.

Defendant's third assignment of error is that the prosecutor, throughout voir dire, asked improper questions. The following

excerpt is typical of the many questions which the defendant challenges.

> [W]e are talking about murder first degree, cold blooded, deliberate murder; consider the aggravating circumstances of the case, how the men were killed; what happened during the time they were killed, and you weigh that against any possible mitigating.
> [Defense counsel interrupts to make objection which is overruled.]
> And then after you weigh that, you may consider the death penalty. It depends on the circumstances.... [T]he question I have for you is: If you found from those circumstance[s]—if you found from the aggravating circumstances that they did outweigh the mitigating circumstance[s], and you felt it was a bad enough case, could you vote for the death penalty?

The defendant first asserts that the prosecutor's questions of this type misstate the law because they imply that the decision to impose a sentence of death is nothing more than weighing aggravating against mitigating circumstances. *Section 565.030.4, RSMo 1986*, however, permits a jury to impose a life sentence even though it determines that aggravating circumstances exist which are not overcome by mitigating circumstances.

 Contrary to the defendant's assertion, the prosecutor's questions did not imply that the decision to impose the death sentence was merely a process of weighing aggravating and mitigating circumstances. As the quoted excerpt reveals, the prosecutor stated only that a capital jury must weigh the aggravating and mitigating circumstances and that if the jury found the aggravating circumstances outweighed the mitigating circumstances it could "consider the death penalty." He stressed, however, that, in the event the jury found that aggravating circumstances outweighed mitigating circumstances, it would still have to decide whether it thought "it was a bad enough case" for the imposition of the death penalty. Similarly, in the other questions challenged by the defendant, the prosecutor was careful to state that the death

penalty was not an automatic punishment, but rather that a jury was permitted to consider it if it found aggravating circumstances outweighing mitigating circumstances. This explanation by the prosecutor correctly summarized the law. *See Section 565.030.4.*

The defendant further asserts that the prosecutor's voir dire questions improperly sought a commitment from the panel members to impose the death penalty. He argues that venirepersons would feel obligated to impose a death sentence in this case after responding affirmatively to questions of the following type: "If you found the aggravating circumstances outweighed by the mitigating circumstances and you felt this was a bad enough case, could you vote for the death penalty?"

■ Control of voir dire examination is in the discretion of the trial court. *State v. Roberts,* 709 S.W.2d 857, 866 (Mo. banc), *cert. denied,* — U.S. ——, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986). "The underlying purpose of voir dire is to determine the ability and willingness of veniremen to follow the law and evidence, and counsel is to be given wide latitude in exposing any latent bias." *Id.* Counsel may not, however, extract a commitment from a venireperson to a particular course of action. *Id.* at 865.

■ By answering the questions at issue here affirmatively, the venirepersons could not reasonably have felt committed to assessing the death penalty in the event they found the defendant guilty of first degree murder. The panel members were asked if they "could" impose the death penalty in the proper circumstances. The prosecutor was simply attempting to determine if any venireperson would be unable to follow the law, which in this case required jurors to consider both death and life sentences. Such an inquiry is proper and does not commit venirepersons to a particular course of action. *State v. Antwine,* 743 S.W.2d 51, 60 (Mo. banc 1987). *See also State v. Green,* 511 S.W.2d 867, 872 (Mo.

1974). The trial court did not abuse its discretion in permitting the challenged questions.

The defendant's next point is that venirepersons Carmella Morris, Georgia Hunter, and Darlene Daramola should not have been excused pursuant to *Section 494.031, RSMo 1986,* because no good cause was shown by these venirepersons for such excuse. *Section 494.031* provides in relevant part:

> The following persons shall, upon their timely application to the court, be excused from service as a juror, either grand or petit:
>
> . . . .
>
> (4) Any person whose absence from his regular place of employment would, in the judgment of the court, tend materially and adversely to affect the public safety, health, welfare or interest;
>
> (5) Any person upon whom service as a juror would in the judgment of the court impose extreme hardship.

Substantial discretion is afforded the trial court with regard to excuses pursuant to *Section 494.031. State v. Gilmore,* 661 S.W.2d 519, 523 (Mo. banc 1983), *cert. denied,* 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed. 2d 476 (1984).

■ Venireperson Morris informed the court that she was a special education teacher scheduled to test a child during the time of trial and that there was no one else to test her. A substitute teacher would not have been allowed to test the child because the files were confidential. Immediate testing of the child would presumably hasten the employment of measures to promote the child's welfare. The court thus could reasonably have found that Morris's absence from her regular employment would materially and adversely affect the public welfare. There was no abuse of discretion in excusing venireperson Morris.

■ Venirepersons Hunter and Daramola both told the court that they had young children who would be forced to spend substantial lengths of time alone if they were required to serve on the jury.

Neither Hunter nor Daramola thought they could make adequate arrangements for someone else to care for their children. The court did not abuse its discretion in excusing Hunter and Daramola. There can be little doubt that it would be an extreme hardship to a parent to be required to leave her small children without adequate care.

▮ *Section 494.031* is directory and not mandatory, and, in challenging a trial court's failure to comply with this statute, the defendant must show that he has been prejudiced or that his interests have been adversely affected by such failure. *Gilmore*, 661 S.W.2d at 523. The defendant does not demonstrate any prejudice.

▮ The defendant next charges error to the trial court's refusal to modify the definition of proof beyond a reasonable doubt contained in *MAI–CR2d 2.20* (now *MAI–CR3d 302.04*). Particularly, the defendant asserts that defining "reasonable doubt" as "doubt based upon reason and common sense" and defining "proof beyond a reasonable doubt" as "proof that leaves you firmly convinced of the defendant's guilt" dilutes the state's burden of proof. This Court has recently held that the "firmly convinced" language, when read in the context of *MAI–CR2d 2.20* as a whole, properly instructs the jury on the required burden of proof. *See State v. Guinan*, 732 S.W.2d 174, 178 (Mo. banc), *cert. denied*, — U.S. —, 108 S.Ct. 308, 98 L.Ed.2d 266 (1987). The state's burden of proof is not diminished by *MAI–CR2d 2.20*'s definition of reasonable doubt.

The defendant next argues that certain statements made by him after his arrest and the identification testimony of Gladys Nutall should have been suppressed as the fruits of an unlawful arrest. The defendant contends that his arrest was unlawful because it was made in his home by police officers without a warrant.

▮ A warrantless arrest in a suspect's home is impermissible absent consent to enter or exigent circumstances.

*State ex rel. Williams v. Marsh*, 626 S.W.2d 223, 236 (Mo. banc 1982) (citing *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980)). The defendant's allegation that his arrest was unlawful, however, fails because the entry of his home by police officers was consensual. The arresting officers were met at the door of the defendant's home by someone whose name the officer in charge did not recall. Then, according to this officer, "the [defendant's] mother came to the door and invited us in." Subsequently this officer remembered that the mother had not come to the door, but rather that "she was in the house, and we heard her voice, and we told the person that answered the door why we [were] there, and we were invited in." Reading this latter testimony in conjunction with the officer's earlier statement that the mother had invited them in, it is reasonable to conclude that the officers were invited in at the direction of the mother. After the officers spoke with the mother, someone went to get the defendant. When he arrived in the living room, he was arrested and then taken to the police station.

Because the officers were invited into the defendant's home by his mother, who apparently also lived in the house, his arrest there was not unlawful under *Payton*. Thus, even if the defendant's statements to the police and Hennings' identification testimony were found to be the fruits of his arrest, their suppression was not warranted.

The defendant next assigns error to the exclusion of his family from the courtroom during the guilt phase of the trial. The trial court excluded those members of defendant's family who would be testifying in the penalty phase of the trial when the prosecutor invoked the rule which requires the exclusion of witnesses from the courtroom during the testimony of other witnesses.

▮ The exclusion or non-exclusion of witnesses is a matter within the sound discretion of the trial court. *State v. Crider*,

419 S.W.2d 13, 14–15 (Mo.1967). In this case, the excluded family members were to testify and thus did come within the rule requiring exclusion of witnesses. The defendant, however, alleges that his family's exclusion prejudiced him because their absence made it appear to the jury that he was abandoned by them. On the contrary, his family was permitted to remain in the court room during the jury selection, those family members who were not going to testify were not excluded from the courtroom at any time, and those who were excluded appeared during the penalty phase to testify in the defendant's behalf. The exclusion from the courtroom of the defendant's family members who were going to testify was not an abuse of the trial court's discretion and did not prejudice the defendant.

The defendant next argues that photographs taken of the victims' bodies after they had been moved and photographs taken during the autopsies of the victims should not have been admitted because they were irrelevant to any fact in issue, cumulative, and unduly inflammatory.

■■■ Trial courts have broad discretion in the admission of photographs. *State v. Guinan,* 665 S.W.2d 325, 331 (Mo. banc), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). Photographs are generally admissible if they are relevant to a material issue. *State v. Daugherty,* 631 S.W.2d 637, 641 (Mo.1982). Photographs, although gruesome, may be admitted where they show the nature and location of wounds, where they enable the jury to better understand the testimony, and where they aid in establishing any element of the state's case. *State v. Gardner,* 618 S.W.2d 40, 41 (Mo.1981).

■■■ The photographs here of the bodies of the murder victims after they had been rolled over by the police show that the victims had been gagged. These photographs show the existence and nature of the gags more clearly than do the photographs taken before the bodies were rolled

over. Evidence that the victims were gagged is relevant to the issue of deliberation in that it is reasonable to conclude that if the murderer had time to gag the victims he also had time to deliberate on his actions before killing them. Because deliberation was an element the state had to prove to establish first degree murder, these photographs had substantial probative value.

■■■ The autopsy photographs at issue here are relevant because they show the nature and location of the victims' wounds and because they enabled the jury to better understand the testimony of the deputy medical examiner who had performed the autopsy. The photographs also show the marks left on the victims' wrists by their bindings. This evidence that the victims were bound is relevant to the issue of deliberation in the same way as is the evidence that the victims were gagged. The existence of oral testimony which described the facts portrayed in these photographs is no reason to reject their admission. *See State v. Clemons,* 643 S.W.2d 803, 805 (Mo. banc 1983).

■■■ Insofar as the photographs here are shocking or gruesome, it is because the crime is one of that sort. *State v. Duisen,* 428 S.W.2d 169, 173 (Mo. banc 1967). If a photograph is relevant, it should not be excluded because it may be inflammatory, unless the situation is so unusual that the extent of the prejudice overrides the photograph's probative value. *State v. Jackson,* 499 S.W.2d 467, 472 (Mo.1973). The photographs here are no more inflammatory than any photographs which accurately showed the body of a person who died from gunshot wounds. Thus, the situation was not unusual and the prejudice resulting from the admission of the photographs did not exceed their probative value. *See id.; State v. Burnfin,* 606 S.W.2d 629, 630 (Mo. 1980). The trial court did not abuse its discretion in admitting the photographs in question.

The defendant next argues that the prosecutor should not have been permitted to

question a police officer as to any statements made to him by Claudia Hennings immediately after she had escaped from her assailants. The defendant contends that such statements were hearsay and served to bolster Hennings' testimony.

 The officer was allowed to testify that Hennings advised him that her friend had been raped and also that she told him the location of the crime scene, the names of the defendant and his brother as two of the assailants, and a description of those two men. This testimony was offered only to explain this officer's subsequent action of reporting to the crime scene and the actions of other officers who responded to the broadcast of the suspects' names and descriptions. Testimony of what another said offered in explanation of conduct rather than as proof of the facts in the other's statement is not inadmissible hearsay. *State v. Brooks*, 618 S.W.2d 22, 25 (Mo. banc 1981). Neither did the officer's testimony serve to improperly bolster Hennings' testimony. The cases relied upon by the defendant in support of this contention are inapplicable. In both *State v. Maxwell*, 502 S.W.2d 382, 391–93 (Mo. App.1973), and *State v. Tyler*, 676 S.W.2d 922, 924–25 (Mo.App.1984), the testimony as to what a victim told a police officer included what was said about the details of the crime. Here, only so much of what Hennings told the officer as was needed to explain subsequent actions of the police was given in the officer's testimony.

 The defendant also argues that the prosecutor should not have been permitted to ask Gladys Nutall if she was "positive and certain" that the defendant was the man she saw shoot Craig Stewart. A positive and unequivocal identification at trial aids in establishing the reliability of the identification. *See State v. Kirk*, 636 S.W. 2d 952, 955 (Mo.1982). The point is denied.

 The defendant's next point is that the trial court erred in refusing to instruct the jury on conventional second degree murder. Conventional second degree murder is a lesser offense included within the offense of first degree murder. *Section 565.025.2(1)(a), RSMo 1986.* The principal distinction between first degree murder and conventional second degree murder is that first degree murder requires that the murderer have deliberated upon the matter of killing another while conventional second degree murder does not. *See Sections 565.020.1 and 565.021.1(1), RSMo 1986.* Trial courts are not obligated to instruct on lesser included offenses unless there is a basis for a verdict acquitting the defendant of the greater offense and convicting him of the included offense. *Section 556.046.2, RSMo 1986. See also Beck v. Alabama*, 447 U.S. 625, 635–43, 100 S.Ct. 2382, 2388–93, 65 L.Ed.2d 392 (1980) (trier of fact in capital case must be allowed to consider lesser included offenses supported by the evidence); *State v. King*, 433 S.W.2d 825, 827 (Mo.1968) (trial court not required to instruct on lesser degrees of homicide when evidence supports first degree murder, but no lesser degree of homicide).

 In this case, the evidence was that after the defendant and two accomplices robbed Jackson, Stewart, Claudia Hennings, and Gladys Nutall, they bound and gagged Jackson and Stewart, placed them on their knees, and then beat the two men while demanding more. Knives were repeatedly stabbed into the floor near the men to further frighten them. Then, after Hennings escaped out the window, Nutall saw the defendant hold Stewart up and shoot him in the back. When police arrived on the scene Jackson and Stewart were found dead of bullet wounds caused by bullets fired from the same weapon. At trial, the defendant's only defense was that it was not him but rather one of his accomplices that shot the men. He did not try to prove that the murders did not take place or that they took place in a manner different from that testified to by Hennings and Nutall. He did not even deny his presence at the apartment. He tried only to throw doubt on the accuracy of Nutall's identification of him as the killer.

The defendant contends that this evidence supports the submission of a second degree murder instruction because it permits a jury to find that the defendant and his accomplices reacted to Hennings' escape with panic and shot Jackson and Stewart in reflex rather than after deliberation. There is no evidence to support this theory and it is belied by Nutall's testimony that the defendant held Stewart up before shooting him in the back. Such testimony is consistent only with the killer holding Stewart steady while deliberately aiming his weapon for a death shot. Also, the evidence that Jackson and Stewart had two bullet wounds each in their upper torsos is consistent with deliberately aimed shots and inconsistent with the conjecture and speculation that the shots were fired in panic. Further, there would have been no reason for the defendant and his accomplices to kill the victims in reflex to Hennings' escape. The victims were bound. They could have made no move to take advantage of the confusion caused by the escape by either attempting to escape themselves or to turn on their assailants.

Unlike the situation in *State v. Johnson*, 505 S.W.2d 94, 95 (Mo.1974), cited by the defendant, the circumstances pointing to deliberation here are not ambiguous and do not require a second degree murder instruction. The evidence supported a finding of a deliberate murder only. *See State v. Amerson*, 518 S.W.2d 29, 33 (Mo.1975) (no second degree murder instruction required where victim was killed while sitting peacefully by street and defense was that defendant was not the killer); *State v. Parker*, 509 S.W.2d 67, 71 (Mo.1974) (no second degree murder instruction required where victims were forced to lie on floor and were then shot and defense was that defendant was not the killer); *State v. Crow*, 486 S.W.2d 248, 254–55 (Mo.1972) (no second degree murder instruction required where victim was bound and strangled and defense was that defendant was not killer); *State v. Holland*, 354 Mo. 527, 543, 189 S.W.2d 989, 998 (1945) (no second degree murder instruction required where victims'

headless bodies, which had two or three shotgun wounds each, were found in a lake and defense was that defendant was not killer).

The defendant next contends that the prosecutor should not have been allowed to make an opening statement at the penalty phase of the trial because the state presented no additional evidence during this phase. This opening statement, according to the defendant, served only to give the prosecutor an opportunity to present additional argument as to why death should be imposed.

■ The scope and manner of opening statement is largely within the discretion of the trial court. *State v. Brooks*, 618 S.W.2d 22, 24 (Mo. banc 1981). One of the purposes of opening statement is to point out the significance of the evidence. *See State v. Bibbs*, 634 S.W.2d 499, 501 (Mo. App.1982). Another purpose of opening statement is to inform the defendant of the contemplated course of prosecution to enable him to fairly meet the charges. *State v. Brigham*, 709 S.W.2d 917, 923 (Mo.App. 1986).

■ Given the bifurcated nature of a first degree murder trial, the prosecutor has already presented evidence when the time comes to make an opening statement in the penalty phase. Even though the prosecutor here decided to present no additional evidence during the penalty phase, it was still within the trial court's discretion to permit him to give an opening statement to point out the significance of the guilt phase evidence as it pertained to the proper punishment for the defendant. The prosecutor stated as simply and dispassionately as possible what evidence presented in the guilt phase established which of the charged aggravating circumstances. The Court finds no error.

■ The defendant further contends that *Section 565.030.4, RSMo 1986*, allows the state to unduly emphasize its case for the death penalty in that it gives the state

the right to present a rebuttal argument to the defendant's closing argument in the penalty phase, but gives the defense no right to present a surrebuttal argument. This right of the state to close the argument is simply an extension of the right the law always gives the state, as the party bearing the burden of proof, to have the final word in criminal cases. The procedure is not unfair. In rebuttal argument, the prosecutor may not introduce any line of argument not made in his opening argument. *See State v. Hale*, 371 S.W.2d 249, 256 (Mo.1963). Thus, the defendant is not put to an unfair advantage by not being able to reply to an argument of the prosecutor.

Finally, the defendant challenges the jury's imposition of the death penalty in this case. The defendant asserts that the evidence was insufficient to support a finding that the murders were outrageously or wantonly vile, horrible or inhuman in that they involved torture or depravity of mind and that the sentence is disproportionate to that imposed in similar cases. These assertions will be considered within the Court's independent review of the defendant's death sentence.

*Section 565.035.3, RSMo 1986*, mandates that the Court conduct an independent review of the imposition of all death sentences. That section requires the Court to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

 The defendant does not argue that his sentence was the product of passion, prejudice, or any other arbitrary factor. The Court, in its independent review of this death sentence, also has searched the record for evidence that the sentence was imposed under the influence of any one of these three circumstances and has found none.

 Pursuant to the second prong of *Section 565.035.3*, the Court finds substantial evidence to support the jury's finding of the existence of the three statutory aggravating circumstances which were submitted with respect to each murder. The evidence that Jackson and Stewart were both taken into the kitchen by the defendant and his accomplices shortly before their lifeless bodies were found there leaves no doubt that each of the murders was committed while the killer was engaged in the commission of another unlawful homicide. The jury was justified in finding that the murders were committed while the defendant was engaged in the perpetration or in the attempt to perpetrate a robbery because there was evidence that the defendant and his accomplices took Jackson's and Stewart's wallets and Hennings' and Nutall's purses; that the assailants ransacked the apartment while asking for money and guns; that the assailants, after asking if Tracy Adams had any guns or money with him, waited three hours for him to arrive; and that the assailants, while beating Jackson and Stewart immediately before killing them, told them "this ain't enough."

The defendant specifically challenges the submission of the statutory aggravating circumstance found in *Section 565.032.2(7), RSMo 1986*, which permitted the jury to determine whether the murders were "outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind." The United States Supreme Court, in *Godfrey v. Georgia*, 446 U.S. 420, 428–33, 100 S.Ct. 1759, 1764–67, 64 L.Ed.2d 398 (1980), required the establishment of clear and objective standards as to what types of murders could be said to have been done with "depravity of

mind." The defendant contends that this Court has not established such standards. This Court, however, rejected a similar argument in *State v. Preston*, 673 S.W.2d 1, 10–11 (Mo. banc), *cert. denied*, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). In *Preston*, 673 S.W.2d at 11, the Court stated:

> In following the mandate of *Godfrey* ..., this Court ... has noted the following factors to be considered in finding "depravity of mind": mental state of defendant, infliction of physical or psychological torture upon the victim as when the victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse and the nature of the crime.

The Court declines to reject the holding in *Preston*.

There is sufficient evidence in this case for a jury to believe that both physical and psychological torture was inflicted upon the murder victims. Evidence that Jackson and Stewart were bound and gagged and then beaten before being killed was unchallenged, as was evidence that the defendant and his accomplices stabbed knives into the floor directly beside the men. There is evidence that the murder victims, as well as Hennings and Nutall, were subjected to prolonged terror in that they had three hours to contemplate their fate while they were being forced to wait with the armed assailants for the arrival of Tracy Adams. Evidence that the defendant participated in the beating of the victims, that he sexually assaulted Claudia Hennings, and that he shot both victims while they were helplessly bound was sufficient for the jury to believe that the defendant's conduct was particularly brutal. Given this evidence of torture and brutality, the jury was justified in finding these murders were outrageously or wantonly vile, horrible or inhuman in that they involved torture, or depravity of mind.

Cases with somewhat similar facts which were found to support a finding of "depravity of mind" are *State v. Foster*, 700 S.W.2d 440, 445 (Mo. banc 1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986), and *State v. Blair*, 638 S.W.2d 739, 759 (Mo. banc 1982), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed. 2d 1030 (1983).

In relation to the final prong of the Court's independent review of the defendant's death sentence, the defendant argues that the imposition of the death sentence in this case is disproportionate to the punishment imposed in similar cases, considering the crime, the strength of the evidence, and the defendant.

In this case the victims were gratuitously murdered in the course of a robbery in which they offered no resistance. This Court has repeatedly upheld death sentences as being neither excessive nor disproportionate in such cases. Of these cases, the following are the most similar to this one: *State v. Pollard*, 735 S.W.2d 345 (Mo. banc 1987); *State v. Young*, 701 S.W. 2d 429 (Mo. banc 1985), *cert. denied*, 476 U.S. 1109, 106 S.Ct. 1959, 90 L.Ed.2d 367 (1986); *State v. Foster*, 700 S.W.2d 440 (Mo. banc 1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986); *State v. Kenley*, 693 S.W.2d 79 (Mo. banc 1985), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986); *State v. Newlon*, 627 S.W.2d 606 (Mo. banc), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed. 2d 149 (1982). The three hours in which the victims were held hostage, the sexual assault on the victims' friend by the defendant, the participation of the defendant in the binding, gagging, and beating of the victims, and the defendant's execution of the victims while they were helplessly bound make the murders in this case at least as heinous as the ones discussed in the cited cases.

The defendant asserts that he was only a minor participant in the robbery and that the degree of his involvement in the

murders is unclear. These factors, the defendant argues, distinguish this case from others in which the death penalty was upheld. This argument, however, is without merit. There was testimony that the defendant held a gun on the victim while his brother ransacked the apartment; that the defendant took Jackson's wallet and Hennings' purse; that he sexually assaulted Hennings; that he helped bind and gag Jackson and Stewart; that he found the knives with which the victims were threatened; that he participated in the beating of the victims; and that he prevented Hennings' first escape attempt and told her he would cut her throat if she did it again. This testimony indicates that the defendant was a willing and active participant in the events leading up to the deaths of Jackson and Stewart. Further, despite Hennings' testimony that the defendant was the assailant wearing the green jacket and Nutall's testimony that he was the assailant wearing the trench coat, Nutall, based on her view of his face, unequivocally identified the defendant as the man she saw shoot Stewart. This testimony, coupled with the evidence that the three whole bullets recovered from the bodies of the victims were fired from the same weapon, is a strong indication that the defendant is the killer of both victims.

The defendant also argues that his minimal criminal record distinguishes this case from those in which a death sentence was found proper. This Court rejected a similar argument in *State v. Johns*, 679 S.W.2d 253, 268 (Mo. banc 1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985), stating that "planned acts of violence as senseless and vile as that inflicted by appellant upon his ... victim warrant exaction of the ultimate penalty." The same can be said here.

The jury's imposition of the death penalty in this case is neither excessive nor disproportionate.

The judgment is affirmed.

DONNELLY, WELLIVER, ROBERTSON, RENDLEN and HIGGINS, JJ., concur.

BLACKMAR, J., concurs in result in separate opinion filed.

BLACKMAR, Judge, concurring in result.

I concur in everything in the principal opinion, except its holding that the trial judge did not err in refusing the defendant's request for an instruction on conventional second degree murder. In so holding, the Court sends the wrong signal to trial judges. The conventional second degree instruction should almost always be given if requested.

The difference between first degree murder (§ 565.020, RSMo 1986) and second degree murder (§ 565.021) is that the latter requires a showing that the defendant acted "knowingly" whereas the former calls for the additional finding of action "after deliberating on the matter." I have never been sure just how a lay jury goes about distinguishing between these two situations, and had understood that, when there is no issue about the defendant's presence at the scene, the jury should be instructed about both offenses. The principal opinion, in holding to the contrary, goes well beyond the cases it cites. In all of them the evidence of the casualty was definitive, and the only defense suggestion was that the defendant was not the criminal actor.[1] The jury well might think that the description of the events in this record did not establish "deliberating." Contrary to the intimation of the principal opinion, the defendant has no burden of introducing evidence to justify a lesser submission. It is only necessary that there be a "basis." Section 556.046.2, RSMo 1986. The "basis" may be found in disbelief of testimony.

The principal opinion, just as the strident questioning from the bench during argu-

1. I rather assume, as the principal opinion does, that the earlier statutes, referring to "deliberation" and "premeditation," are the essential equivalents of the present statutory requirements.

ment, confuses what the jury might find with what it must necessarily find to adjudge guilt. The jury did not have to believe the witness who said that she saw the defendant shoot Stewart. It could still find him guilty of homicide in some degree. It cannot be said, as a matter of law, that the jury could not make a rational finding of guilty of conventional murder in the second degree.

The principal opinion is dangerous because it invites trial judges to court error under *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). This is an unnecessary risk.

It is fortunate that the error is not prejudicial in this case. If one proceeded with strict logic, failure to instruct on a lesser included offense could not be prejudicial error, because the jury would have no occasion to consider the lesser offense unless it fails to find the defendant guilty of the greater. But, by accepted doctrine, and by the compulsion of *Beck v. Alabama, supra,* the jury must be instructed about its authority to mitigate unless the court can say as a matter of law that the jury must either convict of the greater offense charged or acquit. The jury must apparently be told that it has the authority to convict of a lesser offense.

Here the jury found all the elements of murder in the first degree, and, had it been disposed to mitigate, it had the alternative, amply supported by the evidence, of felony second degree murder. I cannot see how an additional instruction on conventional second degree murder would have made a bit of difference.

So I hope that trial judges, in the exercise of prudence and caution, will not refuse requested second degree instructions in the expectation that the reviewing court, just as the principal opinion, will labor to save the conviction if the jury assesses guilt. I should think that prosecutors, also in the exercise of prudence, would not resist a submission of conventional second degree.

There is no occasion to discuss the necessity of a manslaughter submission in the context of this case. There are certainly cases on which a manslaughter finding would be completely irrational. Conventional second degree seldom is in this category.

