STATE of Missouri, Respondent,

v.

David LaRUE, Appellant.

No. 16753.

Missouri Court of Appeals,
Southern District,
Division One.

June 17, 1991.

J. Bryan Allee, Columbia, for appellant.

William L. Webster, Atty. Gen., Robert P. Sass, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Appellant David LaRue, tried as a persistent offender, § 558.016.3,[1] was found guilty by a jury of robbery in the first degree, § 569.020 (Count I), and armed criminal action, § 571.015 (Count II). The trial court sentenced appellant to 15 years' imprisonment on Count I and 10 years' imprisonment on Count II, the latter sentence to run consecutively to the former.

The first of appellant's three points relied on maintains the evidence was insufficient to support the verdicts. On that issue we accept as true all evidence and inferences supporting the verdicts and disregard contrary evidence and inferences. *State v. Evans*, 802 S.W.2d 507, 514[12] (Mo. banc 1991). We determine whether the evidence, so viewed, was sufficient to make a submissible case, *id.*, from which a reasonable juror might have found appellant guilty beyond a reasonable doubt. *State v. Dulany*, 781 S.W.2d 52, 55[3] (Mo. banc 1989).

The victim was Virgie LaRue, appellant's stepmother.[2] The alleged crimes occurred at her home in a rural area of Stoddard County,[3] where she lived alone.

---

1. References to statutes are to RSMo 1986 except where otherwise indicated.

2. At time of trial (November 13, 1989), Mrs. LaRue was 84 years of age.

3. The case was tried in New Madrid County on

Around midnight, August 4, 1988,[4] Mrs. LaRue was awakened by a barking dog and observed appellant and John Delameter outside her screen door. They said they wanted coffee. She opened the door, allowing them to enter. Appellant picked up Mrs. LaRue's telephone, listened, then put it down.

The trio entered the kitchen. Mrs. LaRue made coffee. She and appellant sat at a table and talked while appellant ate from a plate of food she supplied. Delameter was standing near the stove.

Suddenly, Delameter hit Mrs. LaRue on the head. She did not see the object he used. She threw up her arm, blocking a second blow.

Mrs. LaRue saw Delameter reach toward a cabinet, pick up a claw hammer, and draw it back. She jumped from her chair, ran behind appellant and implored, "Don't let 'im hit me no more." Her head was "cut open" and bleeding.

Appellant arose. Mrs. LaRue ran into her washroom. Appellant and Delameter went outside. Asked what happened next, Mrs. LaRue testified:

"... He stayed out a while, I wouldn't say how long, then David come back in.

. . . .

Q. ... what'd he do?

A. Well, I told him I was dyin'.

Q. Okay.

A. So he left back out again.

Q. Okay. Did you try to call anybody on the telephone?

A. I, I told him—Well, he'd done checked the telephone 'n it was dead.

Q. Okay. Then what happened?

A. ... I told him to go someplace and call Wesley Gibson or call the ambulance to come and get me. I said, 'I'll probably be dead in an hour's time.' I told him that.... So he goes back out."

Nothing occurred for awhile, and Mrs. LaRue assumed appellant and Delameter had gone. She went in her front room to

refasten the screen door. She saw appellant and Delameter go past the door, then she heard wires being cut. Her fan and inside lights immediately went off; however, a "post light" outside her home remained on.

Shortly thereafter, she heard someone "beatin' the back window out." She then saw appellant and Delameter outside a window near her bed. Delameter "just broke that window all out over there on my bed, just knocked glass all over my bed."

Mrs. LaRue asked the duo what they wanted. Her narrative continued:

"... They said they wanted my money.

Q. All right.

A. And when I throwed the money out the window he retch out 'n caught it.

Q. Who reached out and grabbed the money?

A. David did.

. . . .

Q. And what happened after that?

A. Well, after I throwed the money out to 'em—They promised me that they'd go away and let me die peacefull [sic].

Q. Uh-huh.

A. I throwed the money out to 'em, 'n when they got the money, well, I didn't see 'em no more.

Q. And who picked up the money?

A. Well, David LaRue. Looked like David LaRue retched around him 'n caught it.

. . . .

Q. ... When you threw your money was it in a purse, or—

A. Best I remember I had it in a little, supposed to of been a cigarette purse.

. . . .

Q. Okay. After they left out with your money, what happened then?

A. Well, I just walked the floor 'n worried 'n wiped blood 'n everything else 'till daylight come.

. . . .

change of venue.

4. The briefs of both parties identify the year as 1989; however, it is clear from the evidence the year was 1988.

Q. And what happened when daylight come?

A. Daylight come I started to walkin'.

Q. And how far did you walk?

A. I walked a mile and a half on a gravel road."

Mrs. LaRue reached a blacktop road where she caught the attention of a truck driver who took her to the home of her son, Wesley Gibson. Gibson took Mrs. LaRue to a Dexter hospital where the wound in her head was stitched and her arm treated and bandaged.

The State presented Delameter as a witness.[5] Delameter testified that a month before August 4, 1988, appellant informed him there was $3,000 in Mrs. LaRue's house. On the night of August 4, Delameter, his wife, and appellant were drinking beer at Delameter's residence in Morehouse. The trio left in appellant's car, appellant driving. Delameter, who was "drunk," recalled appellant saying he was going to Mrs. LaRue's home.

Delameter remembered arriving there and drinking coffee. Then, avowed Delameter, the next thing he knew he had a hammer in his hand and hit Mrs. LaRue. Delameter went outside and threw the hammer in a field.

Delameter recalled Mrs. LaRue throwing money out the window. According to Delameter, "[t]here was about fifty bucks."

Delameter, his wife, and appellant went to Cairo, Illinois. There, said Delameter, he and appellant divided the money, each taking $25.

A deputy sheriff who investigated the incident testified the electric line and telephone line to Mrs. LaRue's home had been cut. The hammer was retrieved by another deputy across the road from the house.

Appellant's first point maintains the evidence was insufficient in that "the State presented no evidence that appellant aided or agreed to aid in the planning or commission of the offenses."

Section 569.020 reads:

"1. A person commits the crime of robbery in the first degree when he forcibly steals property and in the course thereof he, or another participant in the crime,

. . . .

(3) Uses or threatens the immediate use of a dangerous instrument against any person; or

. . . ."

Section 556.061(9), RSMo Supp.1987, reads:

" 'Dangerous instrument' means any instrument, article or substance, which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury[.]"

Under § 562.041.1(2) a person is criminally responsible for the conduct of another when either before or during the commission of an offense, with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense. *State v. Roberts*, 709 S.W.2d 857, 860[1] (Mo. banc 1986), *cert. denied*, 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986).

▉ Appellant argues the evidence failed to establish he acted as a principal or took any affirmative step to aid or encourage the crimes. He maintains there was no evidence of a plan to commit a robbery, and no evidence he forcibly stole anything by using or threatening physical force upon Mrs. LaRue.

We disagree. A month before the incident, appellant told Delameter Mrs. LaRue had $3,000. On the date of the incident, appellant drove himself, Delameter, and the latter's wife from Morehouse to Mrs. LaRue's residence, uninvited, arriving at midnight. There was no evidence of any purpose for the trip except robbery.

It is inferable appellant or Delameter cut the telephone line before entering Mrs. LaRue's home. Mrs. LaRue testified she had

---

5. Delameter had earlier "pled guilty to this charge here out of Stoddard County" and, at time of appellant's trial, was incarcerated in the penitentiary. Delameter's criminal record included a 1968 robbery conviction and 1974 convictions for burglary and tampering.

used the phone around 2:00 p.m., that day and it was working. The jurors could infer appellant, when he lifted the telephone and listened upon entering the house, was ensuring the line was dead. There was no evidence he intended to call anyone or that he expressed surprise or frustration because the phone was inoperative.

Furthermore, had this been a social visit, there is no apparent reason appellant and Delameter would have left the latter's wife outside in appellant's automobile.

After Delameter inflicted the head wound on Mrs. LaRue, appellant did not examine it, summon medical aid, or take her to a hospital. Instead, he and Delameter went outside. Later, appellant accompanied Delameter past Mrs. LaRue's front door, and immediately afterward the electric line was cut. Then, appellant appeared outside Mrs. LaRue's bedside window while Delameter broke it out.

Mrs. LaRue testified that when she asked the two men what they wanted, "They said they wanted my money." When she tossed the money out the window, appellant reached out and caught it. That robbery was the purpose of the trip is compellingly demonstrated by the departure of appellant and Delameter when Mrs. LaRue surrendered her money. She was left injured and bleeding, in an isolated area, with no means of summoning help. She quoted the culprits as saying they would go away and let her die peacefully.

Finally, upon reaching Cairo, Illinois, appellant and Delameter divided the meager spoils equally between themselves.

We are mindful the force employed by Delameter (the blows to Mrs. LaRue's head and arm) did not occur simultaneously with her surrender of the money. However, after delivering the blows, Delameter picked up the hammer and drew it back, whereupon Mrs. LaRue ran behind appellant, then fled to her washroom. The jury could have reasonably found that later, when the bedroom window was broken,

there was an implicit threat of further physical force unless she handed over her money. At that point, so far as Mrs. LaRue knew, Delameter still had the hammer. Her phone was dead, her electricity was off, and appellant was evidently in cahoots with Delameter.

■ In a prosecution for robbery in the first degree under § 569.020.1(3) the evidence need not show the culprit used or threatened the use of the dangerous instrument simultaneously with the taking of the property. *State v. Yancy*, 779 S.W.2d 712, 714–15[3] (Mo.App.1989). The statutory phrase "in the course thereof" is a broad term covering the whole transaction or occurrence. *Id.* If the culprit uses or threatens the immediate use of a dangerous instrument "in the course" of forcible stealing, the offense is robbery in the first degree. *Id.*

Here, Delameter used physical force when he struck Mrs. LaRue on the head and the arm with some unknown object.[6] He then seized the claw hammer, an instrument which, under the circumstances, was readily capable of causing death or serious physical injury. When he drew it back Mrs. LaRue could reasonably fear, as she obviously did, that Delameter intended to use it. Bleeding from the head as a result of the first blow, she ran behind appellant, then into her washroom.

We hold the evidence sufficient to support a finding that there was a forcible stealing of Mrs. LaRue's money and in the course thereof Delameter threatened the immediate use of a dangerous instrument. Consequently, appellant's first point hinges on whether there was sufficient evidence to support a finding that either before or during the commission of the crimes, with the purpose of promoting their commission, appellant aided or agreed to aid or attempted to aid Delameter in committing them.

■ Aiders and abettors who act with common purpose with active participants in

---

6. It is inferable from Delameter's testimony that he struck Mrs. LaRue with the hammer. However, her testimony was that he picked up the hammer after striking her with an object she did not see. Whether his blows were delivered with the hammer or another object is immaterial, as shall become evident *infra*.

a crime incur criminal liability by any form of affirmative advancement of the enterprise. *State v. McGowan*, 789 S.W.2d 242, 243[1] (Mo.App.1990); *State v. Gannaway*, 649 S.W.2d 235, 239[8] (Mo.App.1983). Indicia of aiding and abetting includes presence at the crime scene, flight therefrom, and association with others involved before, during and after commission of the crime. *McGowan*, 789 S.W.2d at 243[2]; *State v. Simpson*, 778 S.W.2d 705, 707 (Mo.App.1989).

Here, appellant (1) told Delameter a month before the incident Mrs. LaRue had $3,000, (2) drove himself, Delameter and the latter's wife to Mrs. LaRue's home at midnight, uninvited, (3) picked up the telephone upon entering, inferably to ensure it had been rendered inoperative, (4) did nothing to obtain medical attention for Mrs. LaRue after Delameter inflicted the head wound, (5) accompanied Delameter past Mrs. LaRue's front door just before the electric line was cut, (6) appeared outside Mrs. LaRue's bedside window while Delameter broke out the glass, (7) caught Mrs. LaRue's money purse when she tossed it out, (8) left Mrs. LaRue alone, bleeding from the head wound, and without means of communication or transportation, (9) fled with Delameter and his wife to Cairo, Illinois, and (10) split the scanty loot with Delameter.

We hold this evidence sufficient to support a finding that appellant, before and during commission of the crimes, with the purpose of promoting their commission, aided Delameter in committing them. Appellant's first point is denied.

■ His second point asserts the trial court erred in giving instruction 4 (MAI-CR 3d 302.04) defining reasonable doubt. Appellant argues that inasmuch as the instruction defined proof beyond a reasonable doubt as "proof that leaves you firmly convinced of the defendant's guilt," the instruction allowed the jury to find him guilty "based on a degree of proof below that required by the due process clause."

Appellant acknowledges the Supreme Court of Missouri has held otherwise. *State v. Murray*, 744 S.W.2d 762, 771[13] (Mo. banc 1988), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Antwine*, 743 S.W.2d 51, 62–63[12] (Mo. banc 1987), *cert denied*, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988).

This Court is constitutionally controlled by decisions of the Supreme Court of Missouri. Mo. Const., Art. V, § 2 (1945); *State v. Jones*, 703 S.W.2d 41, 42[1] (Mo. App.1985). Appellant's second point is governed by *Murray* and *Antwine*. It is, accordingly, denied.

Appellant's third—and final—point avers the trial court erred in finding him a persistent offender.

Section 558.016.3 reads:

"A 'persistent offender' is one who has pleaded guilty to or has been found guilty of two or more felonies committed at different times."

■ The State presented evidence to the trial court that on January 2, 1974, in case 73–CR–523, appellant pled guilty in the Circuit Court of Stoddard County to "Felonious Burglary and Stealing more than $50.00." The State also presented evidence that on the same date, in the same court, in case 73–CR–524, appellant pled guilty to "Felonious Burglary and Stealing." Additionally, the State presented evidence that on December 21, 1964, in case C–22,445 in the Circuit Court of Stoddard County, appellant pled guilty to burglary.

The trial court announced it was unable to find the felonies in 73–CR–523 and 73–CR–524 were committed at different times. However, the trial court concluded this was unnecessary because of the 1964 burglary conviction. The latter burglary was obviously committed at a different time than the felonies in 73–CR–523 and 73–CR–524. Consequently, the trial court found appellant was a persistent offender as defined by § 558.016.3 (quoted above). The formal judgment entered by the trial court December 26, 1989, reflects that finding.

Appellant's third point is based on the assumption the trial court found him to be a persistent offender under "section 558.-019, RSMo Supp.1989." That is the statute which requires a "prior offender," a "per-

sistent offender," and a "class X offender," as therein defined, to serve certain specified "minimum prison terms." Under § 558.019.2(2), if a defendant is a persistent offender, the minimum prison term he must serve shall be 60 percent of his sentence.

The amended information on which appellant was tried makes no mention of § 558.019.[7] The "persistent offender" allegations in the information mention only §§ 558.016 and 557.036.4. The latter statute provides, insofar as pertinent here:

"If the defendant is found to be a prior offender, persistent offender, or dangerous offender as defined in section 558.-016, RSMo:

. . . .

(2) If he has been found guilty of a class A felony, the court may impose any sentence authorized for a class A felony."

Robbery in the first degree is a class A felony. § 569.020.2.

The statute defining the crime of armed criminal action, § 571.015, does not classify such crime in any category of felony. It does, however, provide that anyone convicted of such crime shall be punished by imprisonment for a term not less than three years, in addition to any punishment provided by law for the crime committed by, with, or through the use, assistance, or aid of the dangerous instrument. § 571.015.1. The absence of a stated maximum penalty for armed criminal action indicates a legislative intent that an accused convicted of such crime may be sentenced to any term of years (not fewer than three) up to life imprisonment. *Thurston v. State*, 791 S.W.2d 893, 895[3] (Mo.App.1990).

Section 557.021.3, RSMo Supp.1988, reads:

"For the purpose of applying the extended term provisions of section 558.016 . . . offenses defined outside of this code shall be classified as follows:

(1) If the offense is a felony:

(a) It is a class A felony if the authorized penalty includes death, life imprisonment or imprisonment for a term of twenty years or more;

. . . . "

It is thus evident armed criminal action is a class A felony for purposes of sentencing under § 558.016 and § 557.036.4. That being so, the punishment for appellant's two crimes was not enhanced by the finding he was a persistent offender under § 558.-016.3. The authorized punishment would have been the same had § 558.016 not been invoked.

Appellant concedes that for purposes of § 558.016, there was sufficient evidence to support a finding he was a persistent offender, thereby authorizing the trial court, not the jury, to assess punishment. However, argues appellant, the State's evidence did not establish he was a persistent offender under § 558.019, RSMo Cum.Supp. 1989, for the purpose of requiring him to serve the "minimum prison terms" calculated under that statute.

Appellant bases his argument on § 558.-019.6, RSMo Cum.Supp.1989, which reads:

"If a period of twenty-five years or more has passed between a prior plea of guilty, finding of guilty, or any type of release from the department of corrections, whichever is later, and the present felony and accompanying commitment to the department, then the defendant shall not be classified as a prior offender for purposes of this section."

No such provision appears in § 558.016.

Appellant asserts that because of § 558.-019.6, RSMo Cum.Supp.1989 (quoted above), the December 21, 1964, burglary conviction in case C–22,445 could not be considered in determining whether he was a persistent offender for the purposes of § 558.019. His reasoning, as we grasp it, is set forth hereunder.

---

7. At the time the amended information was filed, there was an approved form for an information charging an accused as a persistent offender under § 558.019. It was MACH–CR 2.30 [1989 Revision] part 2 (1-1-89).

He begins by pointing out (a) there was no proof regarding the date he was released from the department of corrections following the 1964 conviction, and (b) more than 25 years elapsed between the date of that conviction (December 21, 1964) and his commitment to the department of corrections in the instant case (December 26, 1989). Therefore, says appellant, the 1964 conviction could not have been used as a basis for classifying him a prior offender as defined by § 558.019.4(1), RSMo Cum. Supp.1989. If it could not be used for that purpose, argues appellant, it should not be considered in determining whether he is a persistent offender as defined by § 558.019.4(2), RSMo Cum.Supp.1989.

Appellant reminds us the trial court treated the 1974 convictions in cases 73–CR–523 and 73–CR–524 as one conviction because there was no showing those felonies were committed at different times. Consequently, asserts appellant, without the 1964 conviction there was proof of only one prior felony conviction.

We find it unnecessary to decide whether the 1964 conviction could properly be considered by the trial court in determining whether appellant was a persistent offender under § 558.019, RSMo Cum.Supp.1989.

As reported earlier, the amended information on which appellant was tried makes no mention of § 558.019. Additionally, during the hearing on the persistent offender allegations, appellant's lawyer objected to evidence of the 1964 conviction on the ground it was "too old to use under the Missouri statutes." The prosecutor replied:

"Well, I think if you're going to enhance the punishment in terms of the ... you know, the twenty percent, forty percent business, I think that's right. But all we're doing is just using it for the purpose of establishing persistent offender status."

It is obvious the prosecutor was not trying to invoke § 558.019, RSMo Cum.Supp.

1989, whereby appellant would be compelled to serve the "minimum prison terms" spelled out in that section. This is confirmed when one takes note of paragraph 2 of that section. It reads:

"... Other provisions of the law to the contrary notwithstanding, any defendant who has pleaded guilty to or has been found guilty of a felony and served time of imprisonment of not less than one hundred twenty days in the department of corrections or in a penal institution in another state which is equivalent to the department of corrections or a federal prison, the calculation of which shall include any jail time credit and has been committed to the department of corrections as a prior offender, persistent offender, or class X offender shall be required to serve the following minimum prison terms:

...."

The prosecutor presented no evidence regarding any period of imprisonment served by appellant in the department of corrections as a result of any of his convictions. While one could speculate appellant served not less than 120 days in the department of corrections as a result of one or more of his convictions, the record is void of any evidence confirming this.[8]

Furthermore, the trial court made no finding appellant had served time of imprisonment of not less than 120 days in the department of corrections as a result of any of his convictions.

Finally, the formal judgment entered by the trial court contains no finding appellant is a persistent offender within the meaning of § 558.019, RSMo Cum.Supp.1989. As noted earlier, the judgment refers only to: "Persistent Offender (558.016 RSMo)."

We therefore hold appellant was not adjudged a persistent offender under § 558.019, RSMo Cum.Supp.1989. Consequently, the judgment does not require that he serve the "minimum prison terms" speci-

8. A case demonstrating how to prove an accused has been imprisoned in the department of corrections is *State v. Plant,* 461 S.W.2d 736, 737–38 (Mo.1971).

fied in that statute.[9] Hence, appellant's third point is moot.

Judgment affirmed.

MAUS, P.J., and PREWITT, J., concur.

---

**9.** We have not overlooked an oral finding by the trial court, during the persistent offender hearing, that appellant was a "persistent offender as defined in Sections 557.036, 558.016, 558.019, 558.021, Revised Statutes of Missouri." For the reasons set forth above, we hold § 558.019 was not invoked.